## COMMONWEALTH *vs.* CHARLES E. FULLER, JR.

Norfolk. November 6, 1984. — March 13, 1985.

Present: HENNESSEY, C.J., WILKINS, LIACOS, ABRAMS, & LYNCH, JJ.

*Homicide. Constitutional Law,* Assistance of counsel, Confrontation of witnesses. *Practice, Criminal,* Assistance of counsel, Disclosure of evidence.

Evidence at a murder trial, tending to show that the defendant had been at the scene of the murder, that he knew the identity of the victim before an official identification of the victim's body had been made, that he had asked his mother to destroy clothing he had worn on the day the victim was last seen, that he caused his van to be wrecked for fear evidence would be found in it, and that he contrived alibi testimony to be given by prospective witnesses and fled during trial when such testimony was not forthcoming, was sufficient to warrant the jury in finding the defendant guilty of murder in the first degree. [254]

At a murder trial defense counsel's decision not to put forth a claim that the defendant, at a time prior to the events in issue, had suffered a back injury which made it impossible for him to have killed the victim in the manner alleged did not render counsel's assistance ineffective in view of the Commonwealth's evidence indicative of the defendant's agility, the fact that the defendant was heavier and taller than the victim, and the defendant's reliance on an alibi. [255-257]

The judge hearing a motion for a new trial of a criminal case was warranted in his conclusion that defense counsel's eliciting from the defendant's wife testimony indicative of the defendant's criminal record was neither a manifestly unreasonable trial tactic nor the result of negligence or inattention of counsel. [258]

The judge hearing a motion for a new trial of a criminal case was warranted in finding, on conflicting testimony, that defense counsel had not told the defendant to leave the courthouse without permission of the court while his trial was in progress. [258-259]

No substantial risk of a miscarriage of justice resulted from defense counsel's stipulation that a criminal defendant had voluntarily absented himself from his trial. [259-260]

Defense counsel's decisions not to seek a change of venue for a criminal trial or, in the circumstances, to seek to examine prospective jurors respecting their exposure to pretrial publicity, did not show that counsel was ineffective. [260]

At a criminal trial, defense counsel's decision not to call certain witnesses was reasonable in the circumstances and did not show ineffectiveness of counsel. [261]

In view of a witness's voluntary statements on the witness stand concerning her psychiatric history, this court was not required to consider a criminal defendant's contention that the judge, by restricting cross-examination on this subject, had infringed upon his confrontation rights under the Sixth Amendment to the United States Constitution. [261-262]

Items of financial assistance provided by investigating officers and a district attorney's office to two prosecution witnesses at a criminal trial did not constitute an attempt to influence the witnesses' testimony and did not violate any other right of the defendant. [262-264]

INDICTMENT found and returned in the Superior Court Department on September 17, 1979.

The case was tried before *Robert S. Prince,* J., and a motion for a new trial was heard by him.

*Barry P. Wilson* for the defendant.

*David C. Phalen,* Assistant District Attorney (*Charles J. Hely,* Assistant District Attorney, with him) for the Commonwealth.

ABRAMS, J. The defendant, Charles E. Fuller, Jr., appeals from his conviction of murder in the first degree, and from the denial of his motion for a new trial. On appeal, the defendant asserts that the judge should have allowed his motion for a required finding of not guilty. See Mass. R. Crim. P. 25, as amended, 389 Mass. 1107 (1983). The defendant also argues that it was error to deny his motion for a new trial[1] because (1) he was denied his Federal and State constitutional rights to effective assistance of counsel; (2) his Sixth Amendment right to confrontation was violated by the judge's allowance of the prosecution's motion in limine to limit his cross-examination of his mother regarding her psychiatric history; and (3) the prosecution's failure to disclose "inducements" given by it to two damaging witnesses violated his constitutional rights.

---

[1] A single justice of this court remitted the defendant's motion for a new trial to the trial court and stayed the appeal pending disposition of the motion for a new trial.

Last, the defendant asks that we grant him a new trial under G. L. c. 278, § 33E. We have reviewed the trial and motion records and conclude that there is no reason to reverse the conviction and that there is no error in the denial of the motion for a new trial. We also conclude that there is no reason to exercise our power under G. L. c. 278, § 33E. We therefore affirm.

The jury could have found the facts to be as follows. Francis P. Stewart was found dead in Houghton's Pond, Milton, on June 9, 1979, at approximately 3:30 P.M. The post mortem examination determined that Stewart had died of drowning. There were also two superficial slashes on Stewart's neck and abrasions on his knees, elbows, and hands.

The victim was last seen in the company of the defendant when the defendant alone picked him up in his van at about 10 P.M. on June 8, 1979. The next day, when asked where the victim was, the defendant told the victim's roommate that he had dropped the victim off in Perkins Square, in South Boston, on the previous evening, after buying the victim two packs of cigarettes. The victim had never smoked. At 4:30 P.M. that same day, the defendant was overheard telling his mother that Francis Stewart's body had been found. The body was not officially identified until later that evening. In the days just after the murder, the defendant's mother gave a friend a bag containing a man's jacket, a pair of pants, and a pair of shoes, with the instructions that her friend "get rid them." Later, the defendant asked the friend whether she had destroyed the clothes, telling her that she had "to be strong" for him.

On June 11, 1979, the defendant's van was towed to a service station after its windows and headlights were smashed and its tires flattened in unknown circumstances. The defendant later sold the van to the service station owner. When the defendant learned that the service station owner permitted the police to inspect the van, "He wasn't too happy about it."

The defendant was arrested on July 2, 1979. The following morning, he asked to speak with a police officer to whom he said, "No, Sarge, you got the wrong guy. I was there. They were only supposed to break his legs, but they killed him." It is undisputed that the defendant's admission was voluntary.

Further, the jury could have found that in the months before trial, the defendant contrived exculpatory testimony to be given by several witnesses, and that he intimidated at least one witness into testifying falsely on his behalf. The twelve-day trial commenced on December 3, 1979. On December 11, 1979, the defendant was defaulted when he voluntarily absented himself before trial resumed. The defendant voluntarily surrendered to police later that day. The jury found the defendant guilty of murder in the first degree.

1. *Denial of the motion for a required finding.* From our examination of the Commonwealth's evidence in light of the applicable standard, we conclude that the prosecution met its burden to produce evidence sufficient to warrant the jury's inferences and conviction beyond a reasonable doubt. *Commonwealth* v. *Latimore,* 378 Mass. 671, 677-678 (1979). "Circumstantial evidence is competent evidence to establish guilt." *Commonwealth* v. *Rojas,* 388 Mass. 626, 629 (1983). "In conjunction with other evidence, a jury may properly consider actions and statements of a defendant that show a consciousness of guilt." *Id.*

The jury could have found that the defendant was at the scene of the murder and that the defendant knew, hours before identification, that the corpse was that of Francis Stewart because the defendant was the killer. They could have found that the defendant asked his mother to destroy the clothes which he wore on June 8, 1979; that he engineered the wrecking of his van for fear that evidence would be found in it; that he contrived alibi testimony to be given on his behalf by his friends and family; and that he fled during trial because an alibi which he had created would not be forthcoming. The jurors could have found that the defendant's statement that he bought the victim two packs of cigarettes the day of the homicide was false. The evidence viewed in the light most favorable to the Commonwealth is sufficient to withstand a motion for a required finding. "To the extent that [the defendant's] words and his conduct permit conflicting inferences, it is for the jury to determine where the truth lies." *Commonwealth* v. *Amazeen,* 375 Mass. 73, 81 (1978).

2. *Motion for a new trial.* a. *Ineffective assistance of counsel.* The defendant poses five grounds to establish the ineffective assistance of defense counsel at trial. He argues that his attorney: (1) failed to present the viable defense of physical incapacity; (2) negligently and unnecessarily elicited inadmissible evidence of the defendant's prior criminal record at trial; (3) wrongly instructed the defendant to leave the court during trial to search for a missing defense witness, resulting in the defendant's being defaulted by the court; (4) failed to protect the defendant from prejudicial pretrial publicity; and (5) failed to introduce substantial exculpatory evidence. We address each ground in turn.

(1) The defendant contends that his attorney failed to raise "the substantial defense of [the defendant's] physical incapacity to commit the crime as alleged." At the hearing on the motion for a new trial, the defendant introduced evidence that he had been injured on January 5, 1979, while working as an automobile mechanic in California, sustaining a herniated lumbar disc;[2] that he received workers' compensation as a result of that injury; and that he had received a lump sum settlement of $19,000 for that injury prior to trial.

In assessing this claim, we "must examine 'whether there has been serious incompetency, inefficiency, or inattention of counsel — behavior of counsel falling measurably below that which might be expected from an ordinary fallible lawyer — and, if that is found, then, typically, whether it has likely deprived the deprived the defendant of an otherwise available, substantial ground of defence.'" *Commonwealth* v. *Westmoreland*, 388 Mass. 269, 273 (1983), quoting *Commonwealth* v.

___

[2] A medical examination, the results of which were introduced by the defendant at a hearing on the motion for a new trial, was conducted approximately three months before the murder. The physician was "convinced that [the defendant had] near total paralysis of the dorsiflexors of the left foot and toes. Strength in the right — the muscles in the right lower extremity are excellent. Has an area of hypalgesia . . . that approximately corresponds to the L-5 dermatome." The physician recommended a lumbar laminectomy. The physical findings noted on an examination conducted on June 22, 1979, were essentially unchanged, and, again, it was recommended that the defendant undergo a laminectomy. As of the date of the hearing on the motion for a new trial, the defendant had refused surgery.

*Saferian,* 366 Mass. 89, 96 (1974). Accord *Commonwealth v. Street,* 388 Mass. 281, 285 (1983).[3] further, "[w]hen the arguably reasoned tactical or strategic judgments of a lawyer are called into question, we do not 'second guess competent lawyers working hard for defendants who turn on them when the jury happen to find their clients guilty.'" *Commonwealth v. Rondeau,* 378 Mass. 408, 413 (1979), quoting *Commonwealth v. Stone,* 366 Mass. 506, 517 (1974). "Instead, we require that such judgments be 'manifestly unreasonable' (*Commonwealth* v. *Adams,* [374 Mass. 722, 728 (1978)]), and this typically means loss of 'an otherwise available, substantial ground of defence.'" *Commonwealth* v. *Rondeau, supra,* quoting *Commonwealth* v. *Saferian, supra.*

The defendant's prior attorney said at the hearing that he had been aware of the injury at the time of trial but had chosen

---

[3] The Supreme Court has recently enunciated a two-part test of the effective assistance of counsel under the Sixth Amendment to the United States Constitution. See *Strickland* v. *Washington,* 466 U.S. 668 (1984). "A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." *Id.* at 687. Thus, a "court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance," *id.* at 690, and "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

The defendant here claims that he was deprived of both his Federal and State constitutional rights to effective assistance of counsel. Consideration of the Massachusetts test of ineffective assistance of counsel, as set forth in *Commonwealth* v. *Saferian,* 366 Mass. 89, 96 (1974), leads us to the conclusion that if the *Saferian* test is met, the Federal test is necessarily met as well. We accordingly examine the merits of the defendant's challenge on the basis of the *Saferian* standard. We leave open the question of what differences, if any, exist between the two standards.

not to press upon the jury the argument that the defendant's back injury made it impossible for him to have drowned the victim because he "didn't believe it would be believable to the jury." The judge found "an adequate basis for [defendant's] attorney to advise against this type of defense to the murder charge, particularly in view of the defendant's reliance on an alibi regarding his whereabout on June 8, 1979, the night Stewart was killed." We conclude that defense counsel's decision to forgo the defense of physical incapacity was not unreasonable.

The judge found that the attorney, "in the exercise of his best judgment, advised the defendant that alibi was a more valid issue than disability." There was evidence at the hearing that defense counsel vigorously investigated the defendant's injury but was unpersuaded that the defendant was thereby incapacitated. Indeed, defense counsel's doubts about the efficacy of the incapacity defense were borne out at trial, where the Commonwealth presented evidence that the defendant continued to drive a "carry-all" van — one too difficult for his wife to maneuver — with a stick shift during the period between his injury and the murder; that the defendant, two days prior to the murder, was embroiled in a street fight in which he defended himself against a knife attack with his own leather jacket and the unscrewed gear shift stick; that the defendant, although stabbed in the chest during the fight, continued on a planned evening outing with his wife; that the defendant had little, if any, difficulty using his arms; and that the defendant was significantly heavier and taller than the victim. Defense counsel was aware of these several indicia of the defendant's agility.[4] We agree with the judge's conclusion that "[t]he defendant was *not* denied any constitutional right to effective assistance of counsel based on counsel's failure to assert the defendant's disability as evidence of non-commission of the crime" (emphasis in original).

---

[4] We note, moreover, that he had the opportunity to observe the defendant at close range during the months in which they together reviewed defense strategy. Defense counsel never saw the defendant with a cane or a back brace.

(2) The defendant asserts that "[d]efense counsel actually contributed highly prejudicial evidence against his own client, a situation which is arguably even more harmful and inexcusable than depriving the defendant of a substantial defense." Defense counsel conceded at the hearing on the motion that, on direct examination, he had knowingly permitted the defendant's wife to testify that she had first met the defendant when he was "an escapee." The judge, however, found that "[t]he testimony was not the result of surprise caused by negligence or inattention of counsel. It was a calculated tactic employed by counsel to blunt more potentially damaging effect if brought out by the District Attorney."

Defense counsel testified that his "best judgment was that the Commonwealth knew that Mary Ann Fuller had met her husband when he was an escapee," and that he "felt that it was best that that particular aspect of her testimony come out on direct examination as opposed to cross-examination." Essentially, the defense strategy was to take the wind out of the Commonwealth's sails. Such a tactic is not "manifestly unreasonable." Furthermore, even had defense counsel inadvertently allowed the witness to allude to her husband's criminal record, we agree with the judge that "[i]n the totality of the testimony, its prejudicial effect, if any, was minimal."

(3) The defendant alleges that, on the morning of December 11, 1979, defense counsel mistakenly sent the defendant out of the courthouse about one-half hour before the trial was scheduled to begin to search for an alibi witness who had not appeared. The defendant further accuses defense counsel of failing adequately to explain the defendant's absence to the court, as a result of which "Mr. Fuller was defaulted, the trial continuing in his absence, his bail was revoked, and the issues of the flight and consciousness of guilt were introduced in the trial, subjects which would not otherwise have been at issue at trial." At the hearing, the judge heard extensive testimony on this issue. Several members of the defendant's family maintained that they had overheard defense counsel instruct the defendant to leave the courthouse on December 11, 1979, and to telephone when he had located the witness. The judge, how-

ever, stated in his order that he gave that testimony "no credence" and regarded it as "post-trial contrivance . . . entitled to no weight whatever."

"The credibility of . . . the witnesses was a preliminary matter for decision by the trial judge and his decision thereon is final." *Commonwealth* v. *Bernier,* 359 Mass. 13, 16 (1971). Moreover, "[i]t was also proper for the judge to rely on his own knowledge of what took place at trial." *Commonwealth* v. *Levia,* 385 Mass. 345, 353 (1982). No one who testified for the defendant on this issue at the hearing had protested at the time of the default; several of the witnesses had made prior inconsistent statements to the news media at the time of the default; at least one witness was untruthful either at the probable cause hearing or at trial.

Defense counsel testified that he never told the defendant to leave the courthouse without permission of the court on December 11, 1979. This evidence, if believed, warranted the judge's finding that "[t]he defendant left because his defense was disintegrating and he momentarily panicked."

The defendant also urges that the judge abused his discretion in denying his motion for a court-ordered polygraph examination of one witness who testified that defense counsel had told the defendant to absent himself. There is no error. Although polygraph evidence may be used for the limited purposes of impeaching or corroborating a criminal defendant's testimony, see *Commonwealth* v. *Vitello,* 376 Mass. 426, 453-457 (1978), "[a]t this stage of the development of polygraph examinations, we . . . decline to extend the principles of the *Vitello* case beyond the defendant to other witnesses, at least in the absence of an appropriate stipulation (and even then we reserve judgment on the issue)." *Commonwealth* v. *DiLego,* 387 Mass. 394, 398 (1982).

The defendant argues for the first time on this appeal that defense counsel both improperly stipulated at trial to the defendant's having voluntarily absented himself on December 11, 1979, and wrongfully argued this to the jury. Because this issue was not raised below, our inquiry is limited to whether the alleged error resulted in a "substantial risk of a miscarriage

of justice." *Commonwealth* v. *Harris,* 371 Mass. 462, 471 (1976), quoting *Commonwealth* v. *Freeman,* 352 Mass. 556, 563-564 (1967). We see no such risk. Rather, defense counsel's stipulation appears to have been a rational attempt to soften the impact of the defendant's unfortunate and inexcusable decision to flee.

(4) The defendant next alleges that defense counsel erred in failing to request a change of venue to protect the defendant from prejudicial pretrial publicity. At the hearing, defense counsel averred that he had considered the matter of venue, collated the information available to jurors in Norfolk County ("that would be the Globe, the Herald and the Quincy Patriot-Ledger"), and determined not to file for a change of venue. The judge ruled that this decision was neither "negligent nor ineffective." We agree.

Because the body was found in Houghton's Pond in Milton, the trial took place in Norfolk County. Most of the witnesses and the events to which they testified occurred in South Boston (Suffolk County). The judge inquired of the jury venire as to any familiarity with the case by reason of pretrial publicity.[5] The jurors were examined and sworn individually.[6] In short, there is no "showing of prejudice" to the defendant. *Delle Chiaie* v. *Commonwealth,* 367 Mass. 527, 539 (1975). Accordingly, we cannot say that defense counsel's failure to move for a change of venue was error.

---

[5] The judge posed the following question to the entire venire: "Keeping in mind the date, June 8, 1979, if, from June 8, 1979, to this very minute that you sit in the courtroom, if, as a result of anything you have read in the newspapers, seen on television, heard on the radio, or discussed by word of mouth which may have caused you to discuss this case with friends or members of your family, which would indicate that you may have formed an opinion or expressed an opinion in this case, would you indicate by standing." There was no response. The next day, after reading the indictment to the jury, the judge reiterated essentially the same question, again, without response.

[6] When the judge learned, for instance, that the husband of one prospective juror was employed in South Boston, he explained: "The only reason I'm asking is for the benefit of counsel because many of the witnesses, as you heard previously, are from South Boston, and this has a South Boston aspect to it. I want them to be aware of all the information so they can make a free choice here."

The defendant claims for the first time on appeal that his counsel ought to have conducted a searching voir dire of prospective jurors in light of "highly inflammatory and suggestive" publicity surrounding the murder, and later the death of the victim's sister, Donna Stewart. But the mere existence of pretrial publicity is insufficient to establish reversible error: "We have already stated that the [defendant] has not shown that he was tried by a prejudiced jury." *Id.*

(5) The defendant's final allegation as to the ineffectiveness of his representation is that his counsel neglected to present substantial, available exculpatory evidence. Specifically, the defendant contends that defense counsel failed to call certain witnesses to the stand — witnesses who could have strengthened the alibi defense. The judge ruled that that "failure" was "based on due deliberation and the exercise of [counsel's] best judgment." We conclude that the record amply supported that finding.

There was more than sufficient evidence at the hearing to the effect that counsel and his associate diligently interviewed all potential defense witnesses; that each decision whether to call a witness was reviewed with the defendant; and that there was good cause for counsel to have been wary of some witnesses, and more confident in others. These were, without doubt, circumstances in which "[c]ounsel could sensibly conclude that putting them all on the stand would do more harm than good." *Commonwealth* v. *Little,* 376 Mass. 233, 242 (1978).[7] In sum, it is clear that counsel's behavior did not fall measurably below that which might be expected from an ordinary, fallible lawyer.

b. *Cross-examination of the defendant's mother.* The defendant's mother testified at trial. The Commonwealth filed a motion in limine, requesting the court to restrict the cross-examination by defense counsel of the defendant's mother "in three areas: first, the psychiatric history and her treatment therefor; any inquiry into her religious beliefs or her lifestyle;

---

[7] At the hearing on the motion for a new trial, the victim's brother testified about the defendant's alibi. The witness's memory was poor. He admitted on cross-examination that he could not testify as to times with accuracy and agreed that the times were "just kind of guesswork."

thirdly, any cross-examination into her use of prescription or narcotic drugs, which are not the subject of impeachment by criminal conviction." Defense counsel concurred "with reference to addiction, the hospitalization, that [he] would not certainly go into that area and would avoid it." The judge ruled that it was his "duty to, so far as possible, protect the witness as to her psychiatric history"; he "would not require her to admit or to even suggest that she had been under treatment, if she was, or hospitalization, if she was." The defendant maintains that that ruling impermissibly restricted his Sixth Amendment rights. We need not reach that issue because the defendant's mother repeatedly proffered testimony such as: "You know I took a nervous breakdown. I was hospitalized"; "I don't recall it too well. I was on drugs at that time"; "I remained strung out . . . . [u]ntil I took a chemical and clinical breakdown on July 15[, 1979], in my home, and they took me in an ambulance to New England Medical, committed me against my will to Boston State Hospital. Then I haven't had any drugs from that day to this." She said she was "strung out" on "street drugs"; that "Frannie Stewart was [her] man for drugs." The witness's own loquaciousness with regard to her psychiatric and drug history effectively undermined the challenged ruling.[8]

c. *The prosecution's failure to disclose inducements given to witnesses.* The defendant argues that, "[d]espite a specific . . . request for disclosure of promises, inducements or rewards given to witnesses,"[9] the prosecution, in violation of the defendant's due process rights, never revealed to the defense that the district attorney's office had offered assistance to two witnesses

[8] Defense counsel asked for immediate instructions on the use of inconsistent statements for impeachment and the judge so instructed. During cross-examination of the witness, defense counsel informed the judge that he would examine the witness on whether she was under the influence of drugs when her inconsistent statements were made. Defense counsel fully explored the facts which indicated that the witness had made those statements while she was "strung out."

[9] The court allowed defense counsel's pretrial "Motion to Divulge Promises, Rewards and Inducements made to Witnesses" and allowed in part the "Motion for Exculpatory Evidence."

— the defendant's mother and John Palazza. In his order denying the motion for a new trial, the judge found the following. First, "at the time the investigation was underway," the defendant's brother was facing criminal charges in California. The defendant's mother was "concerned about him and was anxious to help him." With the permission of the district attorney, an investigating officer telephoned the district attorney and defense counsel in California merely "to obtain information for Mrs. Fuller." Later, when Mrs. Fuller told the police that she was afraid to return home with her son and family, the officers gave her $50 in cash to get to Cape Cod. The judge held that "[n]o conduct by the police in their dealings with Helen Fuller violated the constitutional rights of the defendant to any degree."

Second, as to John Palazza, the judge found that the witness, fearing retribution, had sought police protection during trial "and that he was assisted by the police in concealing his whereabouts during and after his testimony at trial." At the hearing on the motion, a police officer testified that John Palazza "was provided with some money from the district attorney's office" to fly to Florida after the trial. The judge concluded that "the police and the District Attorney acted honorably and without any effort to intimidate, coerce or induce falsified testimony."[10]

"Evidence tending to show that important government witnesses are *biased* is exculpatory within the meaning of *Brady* v. *Maryland,* 373 U.S. 83 (1963)" (emphasis in original). *Commonwealth* v. *Jackson,* 388 Mass. 98, 112 (1983). However, the judge found that the district attorney's office made no "deal" with either witness and in no way attempted to influence their testimony at trial. Thus, the prosecution, in

---

[10] We note that at trial the assistant district attorney informed the judge that the only promise made to John Palazza was "the statement to him that he is in the position of every other citizen in this Commonwealth, the law enforcement arm of the Commonwealth, the law enforcement arm of the Commonwealth is responsible for his safety, to protect him like we would all other people." Following the witness's testimony, the judge asked: "Do they have a secure place for him? Is that arranged?" The prosecutor responded, "He has a place that he can go, a substantial distance from Boston, which is temporary."

effect, possessed no such exculpatory evidence which ought to have been disclosed. Even if it had, "[w]here it is . . . cumulative . . . courts generally reject the contention that such evidence is material . . . so long as the defense had adequate opportunity to impeach the witness by other means." *Zeigler* v. *Callahan,* 659 F.2d 254, 266 (1st Cir. 1981) (citations omitted), quoted in *Commonwealth* v. *Jackson, supra* at 112. Ironically, Mrs. Fuller made an apparent about face on the stand, retracting inculpatory statements she had previously made about her son. John Palazza, on the other hand, disavowed earlier statements in which he had provided an alibi for the defendant, alleging that he had been intimidated into furnishing the alibi. Defense counsel impeached Palazza and tried to rehabilitate the defendant's mother's testimony by showing that the earlier statements were unreliable because she was "strung out" on drugs and emotionally unstable.

3. *Relief pursuant to G. L. c. 278, § 33E.* After review of the entire record pursuant to G. L. c. 278, § 33E, we conclude that there is no reason to disturb the verdict of guilty of murder in the first degree.

*Judgment affirmed.*

*Denial of motion for new trial affirmed.*