## Commonwealth *vs.* David Murray.

Suffolk. October 8, 1985. — February 11, 1986.

Present: Hennessey, C.J., Wilkins, Liacos, Abrams, & Lynch, JJ.

*Practice, Criminal,* Instructions to jury.

At the trial of indictments for crimes arising out of a masked intruder's armed entry of a dwelling house, no substantial risk of a miscarriage of justice was created by the judge's instructions to the jury which focused on the issue of identification and which the defendant asserted undercut his entire defense that a crime had not occurred, where the instructions, when viewed in their entirety, clearly informed the jury that it was their responsibility to find the facts and that establishing the elements of the crimes charged was part of their fact-finding function. [705-709]

At the trial of indictments for crimes arising out of a masked intruder's armed entry of a dwelling house, the judge's unobjected-to instructions to the jury on identification did not impermissibly intrude on the jury's fact-finding function even though the defendant had not asserted a defense of mistaken identification, but had relied instead on the theory that a crime had not occurred. [709]

A defendant was not denied the effective assistance of counsel by reason of the failure of his attorney to request an instruction to the jury on his theory of the case where the judge's instructions, viewed in their entirety, did not require a new trial and where the defendant's theory of the case was adequately brought to the jury's attention both by the judge's instructions and by defense counsel's closing argument. [709-710]

Indictments found and returned in the Superior Court Department on April 14, 1981.

The cases were tried before *Thomas E. Dwyer,* J.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*Thomas C. Frongillo* for the defendant.

*Robert N. Tochka,* Assistant District Attorney, for the Commonwealth.

Abrams, J. After a trial by jury the defendant was convicted of three armed robberies (G. L. c. 265, § 17 [1984 ed.]), entering

a dwelling house while armed and making an assault on a person therein with intent to commit a felony (G. L. c. 265, § 18A [1984 ed.]), and larceny of a motor vehicle (G. L. c. 266, § 28 [1984 ed.]).[1] A single justice of the Appeals Court allowed the defendant's request for a late appeal. The defendant also appeals from a Superior Court order denying his motion for new trial. In an unpublished memorandum and order, the Appeals Court affirmed the convictions and the denial of the motion for new trial, 19 Mass. App. Ct. 1102 (1984). We granted further appellate review to determine whether the judge's instructions require reversal. We also affirm the convictions and the denial of the motion for new trial.

We summarize the evidence. On Sunday evening, March 1, 1981, at approximately 8 P.M., a woman identifying herself as "Ann" arrived at a house in Dorchester and asked the woman who answered the door, one Tracey Toney, if she could speak to Larry Scott. Tracey assumed that the woman was Ann Strong, Larry Scott's former girlfriend and the mother of a young child, Nathaniel Strong, who was temporarily staying in the house. Tracey went upstairs to find Scott and on her return found two armed men, one of whom was masked. "Ann" had disappeared. The men rounded up several adult occupants of the house, tied them with electrical cords and strips of sheets and robbed them of jewelry, cash, a television set, and a stereo. A third intruder[2] wearing a scarf and blue skull cap arrived later on the second floor.

Dara Toney was struck on the head with a pistol and was later treated at the hospital for a cracked skull. The intruders forced Scott to give them the keys to his car and then left.

---

[1] The defendant was sentenced to the Massachusetts Correctional Institution, Cedar Junction, for a term of not more than twenty nor less than fifteen years on the conviction of entering a dwelling house while armed and making an assault on a person therein with intent to commit a felony. On the three convictions for armed robbery the defendant was sentenced to three terms of not more than fifteen nor less than two years to be served concurrently with the sentence on the other felony conviction and with each other. The larceny conviction was placed on file.

[2] Initially, there was a doubt whether this intruder was a male or female.

Immediately thereafter, one of the Toney sisters called the police. Approximately two minutes later, the police arrived and sent a description and the registration number of the missing automobile over the police radio. A police officer said that, when he arrived, he saw several adults and children in an "hysterical" state. He observed a lump over Dara Toney's right eyebrow and several knotted electrical cords and strips of sheets lying on the floor. The victims described the masked robber as a black male, "tall" (six feet), "built," and wearing a blue ski jacket, dungarees, and black shoes. The masked robber was wearing eyeglasses underneath a blue pullover ski mask. The second robber was described as being a black male, dark complexion, approximately 5'8" tall, with a stocky build and a mustache. He was wearing a knit ski hat and a blue nylon jacket.[3]

Approximately fifteen minutes after the radio dispatch, the police stopped the defendant and his sister in Scott's automobile. There were no masks, guns, or stolen articles in the car. Scott was brought to the place where the automobile was stopped. Scott identified the defendant as the masked assailant.[4]

*The defense.* According to Strong, she telephoned Scott at approximately 3 P.M. to tell him she would pick up her son, Nathaniel.[5] She arrived at the house at 6 P.M. Tracey Toney refused to let her take Nathaniel because Scott was not home.

Strong went to the defendant's home. Strong wanted the defendant to help her regain custody of Nathaniel. Because it was raining the defendant telephoned his sister to get a ride, but she apparently was not home. In any event, Strong and the defendant went to Scott's home by bus. They arrived at 6:45 P.M. Strong and the defendant said that at the house there

---

[3] One of these two robbers had a long scar (six inches by two inches) on his wrist; according to Scott's testimony at trial, it was the masked robber; according to the police report, it was the unmasked robber.

[4] Both Tracey Toney and Scott identified the defendant at trial. Tracey Toney also made an out-of-court identification of the defendant.

[5] At different time periods, Scott and the defendant each had been Strong's "boyfriend." Sometimes Strong stated that Scott was Nathaniel's father; other times she stated Nathaniel was the defendant's son. The defendant had been adjudicated to be the father.

was a twenty-minute, bitter confrontation between Tracey Toney and Larry Scott, and Strong and the defendant. Strong and the defendant left Scott's home without Nathaniel. On leaving the home, they met the defendant's sister who was waiting for them in the rain outside the house.[6] Strong said that Scott had given her a set of keys to his car months earlier, and that she and the defendant took the car "in retaliation." The three of them rode together to Strong's house about two blocks away where Strong got out of the automobile. The defendant and his sister continued on in the car until stopped by police a short time later.

*The instructions.* Defense counsel did not object to the judge's instructions.[7] Our review is therefore limited to determining "whether it was so erroneous that it created a 'substantial risk of a miscarriage of justice.'" *Commonwealth* v. *Pickles,* 393 Mass. 775, 776 (1985), quoting *Commonwealth* v. *Freeman,* 352 Mass. 556, 563-564 (1967). See Mass. R. Crim. P. 24 (*b*), 378 Mass. 895 (1979).

The defendant asserts that the judge erred in his instructions by removing disputed issues of fact from the jury and by expressing his opinion on the credibility of witnesses. In support of his assertions, the defendant "parses the charge and attacks it piecemeal. We, however, view the charge in its entirety since the adequacy of instructions must be determined in light of their over-all impact on the jury." *Commonwealth* v. *Sellon,* 380 Mass. 220, 231-232 (1980). See *Commonwealth* v. *Albert,* 391 Mass. 853, 857-858 (1984).

The defendant asserts that the judge's instructions undercut his entire defense by focusing on the identification issue. This emphasis, he claims, "submerged" the most crucial issue — whether a crime had occurred — and usurped the fact-finding

---

[6] According to Strong, the meeting was coincidental. The Commonwealth offered a United States Oceanographic Survey weather report which stated "no sky cover . . . no precipitation" on the date in question (March 1, 1981).

[7] This issue is raised by the defendant's motion for new trial alleging that his trial counsel was ineffective because he failed to object to the erroneous portions of the instructions and failed to request supplemental curative instructions.

function of the jury. See *Commonwealth* v. *McDuffee,* 379 Mass. 353, 360 (1979). To illustrate this contention, the defendant points to the following language in the instruction: "Now, I think . . . both lawyers would agree that the most important issue in this case, the most important issue in this case is the identification of the defendant as the perpetrator of the crime. The Commonwealth has the burden of proving identity of this defendant as the man who was in that house on the occasion in question . . . . If you are not convinced beyond a reasonable doubt that the defendant was the person — or who had this mask and who did what the Commonwealth says — if you are not convinced beyond a reasonable doubt as to the identity of that man, then you are required to acquit this defendant." The defendant also attacks another portion of the identification instructions as conveying a message to the jury that the crime actually occurred.[8] As a corollary, he argues that the judge, by indicating that the crime had occurred, impermissibly commented on the defendant's credibility.

The Commonwealth responds that the challenged instructions in the context of the over-all instruction "clearly and accurately" informed the jurors that the Commonwealth had to prove the elements of each crime, as well as the identification of the defendant as the perpetrator. In support of its position, the Commonwealth first points to the judge's prophylactic instruction at the outset of the charge in which he cautioned the jurors against making any inference about his opinion of the facts.[9] Next, the Commonwealth points to the particular empha-

---

[8] "You should scrutinize the length of time involved, that elapsed between the occurrence of the crime and the next opportunity of the witness to see the defendant. . . . And I again emphasize that the burden of proof is on the Commonwealth as to every element of the crime charged and this specifically and particularly includes the burden of proving beyond a reasonable doubt the identification of the defendant as one of the assailants here."

[9] After the judge told the jurors that they were required to "take the law from the judge," he added: "However, while that may be true, I want to make an extraordinarily important distinction, and that is that only you have any responsibility in finding the facts in this case. No one else has that responsibility. After you have found the facts, you are then going to apply the law which I am going to give to you and then you are required to render a verdict without choice. But it's important that you realize that only you

sis the judge placed on the jurors' role as fact finders in a case where the testimony was so "widely divergent."[10]

The Commonwealth notes that the judge repeated the admonition to the jurors that they were the sole finders of the facts. When the judge instructed them on their duty in assessing credibility,[11] he told them they must find facts solely from the

---

have any jurisdiction over the facts in this case. Therefore, if that be true, it follows, does it not, that anything that I say during these instructions, any reference that I may make to the facts, any inflection of my voice, any facial expression, nothing which I say in the course of these instructions is intended, nor should it be taken by you, as any indication of how the judge feels you should find the facts, because, as I have just explained to you, finding facts is exclusively your jurisdiction and it is none of the judge's business."

[10] "[Y]our prime and essential function is to find the truth from the evidence that you have heard. Where does the truth lie? And I say that especially in this case because the testimony on each side is so widely divergent, it's so different, it's so inconsistent one with the other. So it's going to be your obligation to resolve those inconsistencies, and you are going to do that by analyzing the evidence and by accepting certain evidence as truthful and reliable and credible, and rejecting other evidence as unreliable and not truthful, and in that distillation process, in that analytical process, you are going to be left with a body of evidence and a body of facts which you say accurately reflect what occurred at the place and at the time involved in this case. So in that selection process, as you examine all this evidence and reject that which is unreliable and accept that which is reliable, in that process you are all judges, because you are judges of the facts, and so you should act as a judge and you should pursue your task seeking the truth as you see it from the evidence."

[11] "Now, juries sometimes ask in their own minds, how are they going to decide what happened at the time and place in question, because they were not there? Well, you are going to do that by examining the evidence that I have referred to . . . you are going to determine what evidence you are going to rely on. You are going to determine what opportunity the witnesses had to observe what they say they did and what ability they had to restate what they saw with accuracy. Putting it in a nutshell, the jury system is the jewel of our judicial system because the jury looks at a case from all sides, because you are all different; you come from different walks of life; and you are going to examine all of the evidence and you are going to determine what evidence you are going to accept as reliable and as believable and as accurate."

evidence,[12] and that the Commonwealth proves guilt by proving the facts beyond a reasonable doubt.[13] Further, the Commonwealth points out that, although the judge omitted the word "alleged" before the word "crime" in the identification instruction, he also used the phrase "who did what the Commonwealth says," thus negating a possible inference that a crime had occurred. In concluding this portion of the instructions, the Commonwealth notes, the judge emphasized that the burden of proof is on the Commonweath as to every element of the crimes charged, which includes the identification of the defendant.

The judge then described the elements of each offense charged and advised the jury that "each of these elements must be established in evidence beyond a reasonable doubt before you may convict the defendant." The defendant does not argue that the "boilerplate" instructions were erroneous. Rather, he asserts that in this case the "boilerplate" instructions undercut his defense and thus exceeded the bounds of proper comment.[14] We do not agree.

---

[12] "Now, you must base your verdict upon the evidence and nothing else. You must base your verdict upon the evidence which is the testimony from the lips of the witnesses and a couple of exhibits that were offered here and marked and which will go with you to your deliberating room, and one or two agreements that were entered into by the lawyers, which they call 'stipulations.' That is the extent of your consideration of the case. Testimony, exhibits and stipulations of agreement by the lawyers."

[13] "Now, I said that the Commonwealth has the obligation of proving the defendant's guilt. How does the — to be very basic, how does the Commonwealth prove guilt? The Commonwealth proves guilt by proving facts and it proves a fact by making you believe the evidence that is offered. So you put to yourself the question: Has the Commonwealth made me believe the facts that it has offered? If they have done that, then they have proved that particular fact. The quality and degree of proof is not dependent upon the number of witnesses either side had. The quality and degree of proof is determined by its strength in inducing belief in the proposition it sets before you."

[14] The defendant cites and relies on *Commonwealth* v. *Sneed,* 376 Mass. 867 (1978). In *Sneed,* "the judge, in many and diverse ways, deprived the defendant of a fair and impartial jury trial." *Id.* at 869. The judge impermissibly questioned and intimidated witnesses, erroneously gave an instruction on the defendant's failure to testify, and in general "adopted the role of an advocate." *Sneed, supra* at 870. Nothing in this case approaches the judge's conduct in the *Sneed* case.

We believe that, read as a whole, the judge's instructions made it very clear to the jury that the responsibility for finding the facts was theirs and theirs alone, and that establishing the elements of the crimes charged was part of the fact-finding function. The omission of the specific words which appellate counsel might have preferred does not require a conclusion that the instructions were so flawed as to necessitate a new trial. The fact is that, if the jurors concluded that the Commonwealth proved each and every element of the crimes beyond a reasonable doubt, they necessarily determined that the crimes occurred.

The defendant next argues that the instructions on identification impermissibly intruded into the jury's fact-finding function. He contends, because he did not assert a defense of mistaken identification, it was error for the judge to instruct on identification as an issue in this case. We reject the defendant's argument. It was incumbent on the Commonwealth as part of its case to prove beyond a reasonable doubt that the masked intruder was the defendant. Thus, some instructions on how jurors should evaluate testimony concerning the identity of the masked intruder were necessary.[15]

Last, the defendant argues that the judge should have commented on his theory of defense. "[T]he defendant was to some extent merely negating the propositions of fact as tendered and sought to be proved by the prosecution, and a negative does not lend itself readily to illustration; . . . [further,] any references to the defendant's theory of the case must steer clear of the shoal of intimating that the jury must accept that theory in order to acquit him." *Commonwealth* v. *Therrien,* 371 Mass. 203, 206 (1976). Trial counsel's decision not to request an instruction on his theory of the case well might reflect a determination on his part that the instructions on the Commonwealth's burden of proof should not be diminished by any

---

[15] We agree with the defendant that the judge misspoke when he said identification was the main issue. However, read as a whole, the two references to identification as the main issue do not require a conclusion that there was a substantial risk of a miscarriage of justice. *Commonwealth* v. *Freeman,* 352 Mass. 556, 563-564 (1967).

reference to the defense. "When the arguably reasoned tactical or strategic judgments of a lawyer are called into question, we do not 'second guess competent lawyers working hard for defendants who turn on them when the jury happen to find their clients guilty.'" *Commonwealth* v. *Rondeau,* 378 Mass. 408, 413 (1979), quoting *Commonwealth* v. *Stone,* 366 Mass. 506, 517 (1974).[16]

We remind counsel that Federal as well as State law requires parties to make their objections to instructions known initially to the trial judge, not the appellate court. "Orderly procedure requires that the respective adversaries' views as to how the jury should be instructed be presented to the trial judge in time to enable him to deliver an accurate charge and to minimize the risk of committing reversible error. It is the rare case in which an improper instruction will justify reversal of a criminal conviction when no objection has been made in the trial court." (Footnote omitted.) *Henderson* v. *Kibbe,* 431 U.S. 145, 154 (1977). Without a valid objection our reviewing function is limited to whether there is a substantial risk of a miscarriage of justice. *Commonwealth* v. *Sheline,* 391 Mass. 279, 291-292 (1984). See Mass. R. Crim. P. 24 (*b*), 378 Mass. 895 (1979). No such showing is made on this record.[17]

> *Judgments of the Superior Court affirmed.*
>
> *Order denying motion for new trial affirmed.*

---

[16] Because we believe that the judge's instructions read as a whole do not require a new trial, we do not view counsel's failure to object as "serious incompetency, inefficiency, or inattention . . . falling measurably below that which might be expected from an ordinary fallible lawyer." *Commonwealth* v. *Saferian,* 366 Mass. 89, 96 (1974). *Commonwealth* v. *Fuller,* 394 Mass. 251, 256 n.3 (1985). Further, the failure to object did not deprive the defendant of an otherwise available, substantial ground of defense. *Id.* The defense's theory was brought to the attention of the jury by the judge's instructions during the trial, by defense counsel's closing argument, and by the judge's full instructions on the widely divergent testimony and the jury's exclusive function in resolving conflicting testimony.

[17] We agree with the Appeals Court's assessment and resolution of the other issues raised by the defendant on appeal. Those issues are without merit. No useful purpose is served by further comment.