COMMONWEALTH vs. HAVEN TRIPLETT.

Hampden.    September 9, 1986. — November 18, 1986.

Present: HENNESSEY, C.J., WILKINS, LIACOS, ABRAMS, & O'CONNOR, JJ.

*Homicide. Evidence,* Prior misconduct, Cross-examination. *Witness,* Cross-examination. *Practice, Criminal,* Cross-examination by prosecutor, Argument by counsel, Stipulation. *Constitutional Law,* Assistance of counsel.

At a murder trial, the improper admission of evidence of prior incidents of misconduct by the defendant, followed by the prosecutor's explicit references to such incidents to demonstrate that the defendant was violent and dangerous, was so prejudicial as to require reversal of the defendant's conviction of murder in the first degree. [562-564]

Where, during cross-examination of a defendant on trial for the murder of his mother's fiance, the prosecutor repeatedly asked improper questions calling for the defendant's assessment of the credibility of his mother, who had been the Commonwealth's principal witness against him, the resulting prejudice to the defendant presented a substantial risk of a miscarriage of justice, requiring reversal of his conviction of murder in the first degree. [564-567]

Where, during closing argument in a murder case, defense counsel conceded the defendant's lack of credibility on the only theory of the defense, namely, that the killing had occurred in the heat of passion on sudden provocation, the result was to deprive the defendant of his constitutional right to the effective assistance of counsel. [568-569]

At the retrial of a criminal case, a stipulation as to testimony would leave the trier of fact free to determine the facts based on the agreed evidence. [570]

INDICTMENT found and returned in the Superior Court Department on July 13, 1984.

The case was tried before *George C. Keady, Jr., J.*

*John M. Thompson* for the defendant.

*Ariane D. Vuono,* Assistant District Attorney, for the Commonwealth.

ABRAMS, J. On April 19, 1984, the defendant, Haven Trip-
lett, shot and killed Gregory Finch in a house occupied by the
defendant, the defendant's mother, and the victim, who was
the fiancé of the defendant's mother. After a trial by jury, the
defendant was convicted of murder in the first degree. He
appeals, claiming that the judge erred in admitting evidence
of his prior misconduct. He also asks that we grant him a new
trial because the Commonwealth impermissibly cross-
examined him on the issue of the credibility of its main witness,
his mother, and because his trial counsel conceded a critical
issue, namely the defendant's lack of credibility, in the sum-
mation. The defendant asserts that a review of the record as
a whole supports a conclusion that there is a substantial likeli-
hood of a miscarriage of justice. See G. L. c. 278, § 33E
(1984 ed.). We agree. We reverse and remand for a new trial.[1]

1. *Evidence of the defendant's prior misconduct.* During its
case-in-chief, the Commonwealth offered evidence that the
defendant allegedly assaulted his mother prior to the events at
issue and that the defendant lost his job at a nursing home
because he could not control his temper. Further, on cross-
examination, the Commonwealth elicited the fact the defendant
had received a less than honorable discharge from the Army.[2]

"It is well settled that the prosecution may not introduce
evidence that a defendant previously has misbehaved, indicta-
bly or not, for the purposes of showing his bad character or
propensity to commit the crime charged, but such evidence
may be admissible if relevant for some other purpose" (citations
omitted). *Commonwealth* v. *Helfant, ante* 214, 224 (1986).
Evidence is relevant if it "relates to a subsidiary issue, such
as the state of mind of the defendant, and is not offered to
prove his guilt but rather to prove a relevant subsidiary fact."

---

[1] We note that appellate counsel for both the defendant and the Common-
wealth were not trial counsel.

[2] Defense counsel did not object during the direct examination of the
mother regarding the alleged assault. Counsel did, however, object to the
Commonwealth's cross-examination of the defendant on this subject. Coun-
sel did object to evidence of the loss of the job and the less than honorable
discharge from the Army.

*Commonwealth* v. *Trapp,* 396 Mass. 202, 206 (1985). Other subsidiary issues which may be proved by evidence of prior bad acts include a "common scheme, pattern of operation, absence of accident or mistake, identity, intent, or motive." *Helfant, supra.* These exceptions, however, "are not without limitation." *Trapp, supra.* If such evidence is improperly admitted, it "diverts the attention of the jury from the [crime] immediately before it; and, by showing the defendant to have been a knave on other occasions, creates a prejudice which may cause injustice to be done him." *Commonwealth* v. *Jackson,* 132 Mass. 16, 20-21 (1882).

The evidence of the defendant's prior bad acts was not admissible on any theory of common scheme, pattern of operation, absence of accident or mistake, identity, intent, or motive. Rather, the evidence portrayed the defendant as a violent, aggressive, and dangerous individual. Indeed, the prosecutor so argued in his closing: "What are we really talking about in this case? What we are talking about is a human being that has a habit of acting inappropriately to certain situations, that's all, that's all this is in a nutshell." Referring explicitly to the alleged incident between the defendant and his mother and to the defendant's losing his job, the prosecutor concluded that: "Of course, this is just a case of a man who can't control his emotions. . . . He's a powder keg, he doesn't think. He acts out of violence. He's got a horrendous temper that he can't control, that's what this is all about. And that's murder in the first degree, ladies and gentlemen." In short, the Commonwealth used this evidence to prove that the defendant had a bad temper, and, therefore, was guilty of murder in the first degree.

The Commonwealth asserts that the evidence regarding both the alleged assault of the defendant's mother and the defendant's military discharge was introduced for purposes of disproving the defendant's testimony. This claim is without merit. The evidence of the alleged assault was offered through the defendant's mother prior to the defendant's testimony. As to the less than honorable discharge brought out during the Commonwealth's cross-examination of the defendant, the defendant

said on direct examination that he had not finished his tour of duty. Because that statement is not disproved by evidence that the discharge was less than honorable, the Commonwealth cannot claim that it sought to impeach the defendant's credibility with this evidence. See *Commonwealth* v. *Spare,* 353 Mass. 263, 266-267 (1967); *Commonwealth* v. *Parker,* 12 Mass. App. Ct. 955, 956 (1981).

There also was no basis for offering evidence that at another time the defendant lost his nursing home job as a result of his throwing a book at a supervisor. That evidence "lacks any rational link" to the events on the night of April 19, 1984. *Commonwealth* v. *Trapp, supra* at 207. Moreover, the prosecutor in his cross examination of the defendant used the evidence as an analogy to the defendant's guilt of murder in the first degree.[3]

The evidence of the defendant's prior bad acts does not fall within any of the exceptions to the general rule prohibiting admission of such evidence. The improper character evidence cannot be said to be nonprejudicial. We reverse and remand for a new trial.

2. *Cross-examination of the defendant.* The defendant next asserts that the Commonwealth's cross-examination requiring the defendant to comment on his mother's truthfulness violated his right to a fair trial. On appeal, the Commonwealth acknowledges that some of the questions were improper but argues that the effect of the questioning does not amount to prejudicial error. Because defense counsel did not object to these questions at trial, our review is pursuant to G. L. c. 278, § 33E. See *Commonwealth* v. *Cole,* 380 Mass. 30 (1980). We agree with the Commonwealth that the questions were improper and with the defendant that, as a result of the improper questioning, there is a substantial likelihood of a miscarriage of justice.

---

[3] Q: "Are you saying [the book the defendant allegedly threw at his supervisor] slipped out of your hand?"

A: "Yes, it did."

Q: "Just like you accidentally shot [Finch] on the night of April 19th, right, is that right?"

A: "I'm not saying what happened was an accident."

The defendant's mother, the Commonwealth's main witness, testified on direct examination that on April 19, 1984, a heated discussion took place between the defendant and Finch over responsibility for household expenses. The argument occurred in the bedroom shared by Finch and the defendant's mother.

The defendant's mother said that during the argument Finch pulled a knife out of his pocket. She also testified that Finch did not lunge at the defendant. The mother said that at that point the defendant turned and walked normally and relatively calmly out of the bedroom. According to the defendant's mother, she spent a few minutes talking with Finch, trying to calm him down, and then she left her bedroom to go and talk to the defendant. From the door of the defendant's room, she saw the defendant loading a gun. According to the mother, the defendant said he intended to kill Finch. The defendant then headed toward Finch's bedroom. The mother grabbed the defendant, trying to hold him back. The defendant knocked her off balance and ran toward Finch's bedroom. The defendant's mother followed him. According to her, she saw the defendant point the gun in the direction of the foot of the bed. From her vantage point, she could not see Finch. She heard one shot fire.

After the first shot, the defendant backed out of the room. The defendant's mother began scuffling with her son. She heard a "thud," and she turned and saw Finch lying face down on the floor. According to the mother, her son also turned around, pointed the gun downward, and shot the victim two more times. The defendant then said to his mother, "[Y]es, I killed him." The mother called the police. The defendant ran out of the house.

The defendant, testifying on his own behalf, said that during the argument, Finch lunged at him with a knife. At this point, the defendant ran to his bedroom, grabbed a gun, and ran toward Finch's bedroom. He asserted that he saw his mother in the hallway. She was cut and bleeding. As the defendant ran back toward Finch's bedroom, Finch again lunged at him. The defendant then fired a shot at Finch. Finch kept coming

at him. The defendant fired several more shots.[4] He and his mother struggled outside the bedroom, and the gun accidently fired a last time and hit Finch, who was lying face down on the living room floor. Following the shooting, the defendant ran from the house, dropping the gun in a nearby schoolyard as he fled. He went to New Haven, Connecticut. Six weeks later he surrendered to the police.

In cross-examining the defendant, the Commonwealth repeatedly asked him about those parts of his mother's testimony that contradicted his own. The prosecutor asked whether the defendant had heard her testimony and whether he agreed or disagreed with it. We set out some examples of this line of questioning in the margin.[5]

---

[4] The defendant asserted that he was so "upset and confused" at the time that he did not remember how many shots he fired.

[5] Q: "Did you hear your mother yesterday say [Finch] never struck her, did you hear her say that?"
A: "Yes."
Q: "You disagree with that?"
A: "I'm not going to call my mother a liar."
Later, the cross-examination proceeded as follows:
Q: "Did you hear your mother say yesterday [Finch] never lunged at you or anyone else with the knife?"
A: "Yes."
Q: "Is that correct?"
A: "No."
Q: "Did you hear your mother say from the time you left the room at a normal walking pace to the time that [Finch] got shot three times, a period of about four to five minutes went by?"
A: "Yes, I heard her say that."
Q: "Is that correct?"
A: "No, it's not."
Similar colloquies occurred throughout the cross-examination. The prosecutor ended his line of questioning with the following:
Q: "[Would you tell this court and jury if you know] why she said you were shooting at him in cold blood? You tell us why she did that, do you have any idea?"
A: "I really don't know. Maybe she's trying to seek revenge. Maybe she's confused about what happened, she's not sure herself what happened.
"Maybe she's still in love and mourning for him. Maybe she doesn't want to accept the truth about the type of person [Finch] really was."
This form of questioning permeated the entire cross-examination of the witness.

It is a fundamental principle that "a witness cannot be asked to assess the credibility of his testimony or that of other witnesses." *Commonwealth* v. *Dickinson*, 394 Mass. 702, 706 (1985). See *Commonwealth* v. *Long*, 17 Mass. App. Ct. 707, 708 (1984); *Commonwealth* v. *Ward*, 15 Mass. App. Ct. 400, 401 (1983); P.J. Liacos, Massachusetts Evidence 147 (5th ed. 1981). The fact finder, not the witness, must determine the weight and credibility of testimony. *Commonwealth* v. *Dabrieo*, 370 Mass. 728, 734 (1976).

In this case, the credibility of the mother and her son was the critical issue before the jury. The jurors had to determine whether to accept the version given by the mother or that given by her son. The questioning by the prosecutor was designed both to discredit the defendant by pointing out the inconsistencies between his testimony and that of his mother and to try to make the defendant say that his mother was a liar. Such a tactic is impermissible.

The relationship between the two witnesses, that of mother and son, magnifies the prejudice caused by the improper questioning. Pitting mother against son by repeatedly questioning the son as to his mother's credibility in these circumstances cannot be said to be nonprejudicial. Compare *Commonwealth* v. *Long*, 17 Mass. App. Ct. 707 (1984), with *Commonwealth* v. *Flanagan*, 20 Mass. App. Ct. 472 (1985), and *Commonwealth* v. *Ward*, 15 Mass. App. Ct. 400 (1983). Where, as here, the evidence presents a duel of credibility, asking a witness to opine as to the honesty of the other witness's testimony cannot have a "nonprejudicial [nor] inconsequential effect on the deliberations of the jury." *Commonwealth* v. *Long, supra* at 710. Pursuant to our plenary power under G. L. c. 278, § 33E, we reverse and remand for a new trial. See G. L. c. 278, § 33E; *Commonwealth* v. *Cole*, 380 Mass. 30, 38-39 (1980).

3. *Defense counsel's summation.* The defendant challenges several aspects of the representation afforded him at trial by his counsel. He argues that defense counsel failed to present persuasively to the jury his own theory of the case.[6] Defense

---

[6] The defendant also asserts that defense counsel's direct examination of the defendant lacked any coherent quality. Further, he claims that counsel's

counsel tried his case on the theory that the defendant killed the victim in the heat of passion and that, at most, he should be convicted of manslaughter.

In assessing a claim of ineffective assistance of counsel,[7] we must appraise "the specific circumstances of the given case to see whether there has been serious incompetency, inefficiency, or inattention of counsel — behavior of counsel falling measurably below that which might be expected from an ordinary fallible lawyer — and, if that is found, then, typically, whether it has likely deprived the defendant of an otherwise available, substantial ground of defence." *Commonwealth* v. *Saferian,* 366 Mass. 89, 96 (1974). See *Commonwealth* v. *Fuller,* 394 Mass. 251, 256 (1985); *Commonwealth* v. *Bryant,* 390 Mass. 729, 749 (1984); *Commonwealth* v. *Street,* 388 Mass. 281, 285 (1983). A defendant is demonstrably harmed if there is "some showing that better work might have accomplished something material for the defense" (footnote omitted). *Commonwealth* v. *Satterfield,* 373 Mass. 109, 115 (1977).

"[C]losing argument for the defense is a basic element of the adversary factfinding process in a criminal trial." *Herring* v. *New York,* 422 U.S. 853, 858 (1975). "[N]o aspect of [our adversary system] could be more important than the opportunity finally to marshal the evidence for each side before submission of the case to judgment." *Id.* at 862. A summation by defense

---

failure to cross-examine the mother both on her grand jury testimony describing the events in a fashion similar to the defendant's version and on the medical evidence that contradicted her account of the angle of the second shot constitute ineffective assistance. Finally, the defendant asserts that defense counsel effectively abandoned several viable defense theories by explicit disavowal of the defense of self-defense, and by his failure to request instructions regarding excessive force, accident, and involuntary manslaughter. Because we are reversing the judgment of conviction, we do not reach or decide the merits of any of these claims.

[7] The defendant does not state whether his claim of ineffective assistance of counsel is based on Federal or State constitutional grounds. See *Strickland* v. *Washington,* 466 U.S. 668 (1984); *Commonwealth* v. *Saferian,* 366 Mass. 89 (1974). Because we are reversing on a number of grounds, we need not determine the basis of the defendant's claim. We merely note that, in our view, "if the *Saferian* test is met, the Federal test is necessarily met as well." *Commonwealth* v. *Fuller,* 394 Mass. 251, 256 n.3 (1985).

counsel which leaves a client "denuded of a defense" constitutes ineffective assistance of counsel. *Commonwealth* v. *Street, supra* at 287.

Defense counsel in this case presented only the theory that the killing of Finch occurred in the heat of passion on sudden provocation and requested a verdict of guilty of manslaughter. Defense counsel asked the jury in his closing argument to believe the testimony of the mother "a hundred percent." He reiterated this point by asking that the jury accept all of her testimony. In addition, he stated, "I will concede to you other things that Haven Triplett may not have been as honest as his mother. And I will concede to you he had motive because he's on trial here."

As the discussion of the disputed facts indicates, see *supra* at 565-566, the evidence raised a question whether the defendant acted with deliberately premeditated malice aforethought or whether he acted in the heat of passion. There was a "classic duel of credibility" between the two main witnesses. If the jury were to believe the testimony of the mother "a hundred percent," they had to reject the defendant's testimony. They also had to conclude that the defendant acted with deliberately premeditated malice aforethought. The comments by defense counsel implying disbelief of his client's testimony and asking the jurors to accept the defendant's mother's version "a hundred percent" eroded any theory of voluntary manslaughter.

Counsel's statements in his closing were "tantamount to an admission of his client's guilt," and, by giving credit to the mother's testimony, "[c]ounsel abdicated his client's position," *People* v. *Carter,* 41 Ill. App. 3d 425, 429 (1976), and left the client "denuded of a defense." *Commonwealth* v. *Street, supra.* In such circumstances, a defendant is denied effective assistance of counsel.

4. *Issues likely to arise at retrial.* There is some dispute concerning the judge's charge regarding a testimonial stipulation entered into by the parties. We briefly comment on the differences between a testimonial stipulation and a stipulation of facts because the issue may arise at retrial.

If controvertible facts are agreed to by stipulation, those facts no longer are at issue and must be accepted by the fact finder. A stipulation as to testimony, in contrast, leaves to the trier of fact its role of determining the facts based on the agreed evidence. See *Frati* v. *Jannini,* 226 Mass. 430, 431 (1917). See also P.J. Liacos, Massachusetts Evidence 16 (5th ed. 1981). Therefore, a jury cannot be compelled to accept as true all the facts within the stipulated testimony. Instead, they may accept that testimony which, if the witness were to testify, they would find credible and they may reject the remainder or they may accept or reject the testimonial stipulation in its entirety.

The judgment of the Superior Court is reversed, the verdict set aside, and the case is remanded to the Superior Court for a new trial.

*So ordered.*