COMMONWEALTH *vs.* GREGORY SALONE. No. 87-629. July 8, 1988. *Assault and Battery by Means of a Dangerous Weapon. Witness,* Intimidation. *Evidence,* Prior misconduct. *Self-Defense. Practice, Criminal,* Indictment.

The defendant was convicted by a jury of assault and battery by means of a dangerous weapon and the intimidation of a witness. He was acquitted on two indictments that charged him with uttering a threat to murder. He raises two issues on appeal, namely, whether there was improper cross-examination of a defense witness and of the defendant in regard to the defendant's "bad temper," and whether the judge allowed an improper amendment to the indictment.

The jury could have found the following facts from the evidence. A week to ten days prior to February 9, 1985, the defendant and his friend, Lisa LaPlante, agreed to rent an apartment on Clifton Street, Springfield, from Stephen Phillips. On February 9, Phillips asked his roommate, Eugene D'Angelo, the victim, to go over to the Clifton Street apartment and check a heater. When D'Angelo arrived at the building, the defendant, LaPlante, and one Harvey Councilman were there in Councilman's pick-up truck. The defendant immediately confronted D'Angelo and asked him where Phillips was and when he could move in. D'Angelo responded that he knew

---

nothing about it and went into the apartment building. The defendant followed D'Angelo into the building and continued to question him about Phillips' whereabouts. D'Angelo discovered that the heater was out of fuel and left the building. Outside, the defendant persisted in asking D'Angelo about Phillips.

D'Angelo returned some time later with propane for the heater. The defendant was still there and again questioned D'Angelo about when he could move into the apartment. D'Angelo again told the defendant that he did not know anything about it and that the defendant should talk to Phillips about it.

D'Angelo left the premises again, this time to get some tools. He saw Phillips at their home and told Phillips that the defendant was on the scene. Phillips told D'Angelo to tell the defendant that he could not move in because the pipes in the building had broken.

Once again D'Angelo returned to the Clifton Street apartment. This time he brought with him his dog, a Doberman pinscher, which he described as a puppy. The defendant, LaPlante, and Councilman were leaving in the truck, with Councilman driving. Councilman pulled his truck into the other lane, blocking D'Angelo's way. The defendant got out of the truck and confronted D'Angelo. Angry words were exchanged. D'Angelo testified that the defendant hit him with a "black leather thing." The defendant admitted that he kicked D'Angelo once in the face with his shoe but said that he did it in self-defense after D'Angelo pushed him and threatened to order his dog to attack him.

1. *The "bad temper" testimony.* The defendant's story that he was acting in self-defense was corroborated, in some material aspects, by the testimony of LaPlante and Councilman. LaPlante testified that after D'Angelo called to his dog, "[t]hat's when [D'Angelo] pushed [the defendant] and I just laid my head down on the seat and that's all I seen."

The prosecutor opened his cross-examination of LaPlante by asking a series of questions, set out in the margin, about the defendant's temper.[1]

---

[1] Q: "Let's forget February 9th for a moment. He's got a bad temper, doesn't he?"
A: "Sometime."
Q: "Well, he's got a bad temper, doesn't he?"
A: "Sometime."
Q: "You've seen him explode a number of times prior to February 9th; haven't you?"
A: "Not that many times."
Q: "Well, give us your best estimate as to how many times."
A: "A couple of times."
Q: "The same way he did on the 9th when he learned he couldn't get in the apartment?"
A: "No."

Later, he returned to the same theme, as shown by the questions in the margin.[2] There was no objection to this line of questioning.

On cross-examination of the defendant, the prosecutor resumed his inquiry in regard to the defendant's temper.[3] Also in his closing argument, the prosecutor, on at least two occasions, referred to evidence that the defendant possessed a bad temper.[4]

On appeal, the defendant argues that the prosecutor's cross-examination on the subject of the defendant's bad temper as shown on prior occasions violated *Commonwealth* v. *Triplett*, 398 Mass. 561, 562-564 (1986). Because there was no objection to the introduction of such evidence or to the prosecutor's reliance on it in his closing argument, "[t]he test is whether there is a substantial risk of a miscarriage of justice." *Commonwealth* v. *Freeman*, 352 Mass. 556, 564 (1967).[5]

The long-standing rule, restated in *Triplett*, is that, unless a defendant has made his character an issue in the trial, "the prosecution may not introduce evidence that a defendant previously has misbehaved, indictably or not, for the purposes of showing his bad character or propensity to commit the crime charged, but such evidence may be admissible if relevant for some other purpose." *Commonwealth* v. *Triplett*, *supra* at 562, quoting

---

[2] Q: "Why did you put your head down?"
A: "Because I didn't want to see it."
Q: "Because you knew what Greg was going to do to him."
A: "Yes."
Q: "That was based on your knowledge of what type of temper he had."
A. "Yes."

[3] Q:"You've got a bad temper, and wouldn't you admit to that today?"
A: "No."

. . .
Q: "Do you think your girlfriend was incorrectly assessing you when she said that you had a bad temper?"
A: "I can get mad just like everybody else. I can get angry just like everybody else."
Q: "Do you think that you have a bad temper, sir?"
A: "No."
Q: "Did you hear her say that when she saw you being pushed, she hid down because she didn't want to see what was going to happen? Did you hear her say that?"
A: "Yes."
Q: "Do you think that she had a cause to bend down and not to look through that windshield?"
At this point, defense counsel objected and the prosecutor ended the cross-examination.

[4] At one point the prosecutor said the following:

"This is what the story is all about. A guy with a bad temper who had a bad afternoon who wasn't going to leave there until he took someone with him, and Phillips wasn't there, so he did the next best thing. He was going to get a piece of Mr. D'Angelo to satisfy his anger and to satisfy his infuriation before he left. That's exactly what this story is about."

[5] The *Triplett* decision was issued eleven months after the trial of this case.

from *Commonwealth* v. *Helfant*, 398 Mass. 214, 224 (1986). In *Triplett*, at the defendant's trial for murder in the first degree, the Commonwealth offered evidence that the defendant assaulted his mother prior to the events at issue and that the defendant had lost his job at a nursing home because he could not control his temper. The court stated, "The evidence of the defendant's prior bad acts was not admissible on any theory of common scheme, pattern of operation, absence of accident or mistake, identity, intent, or motive. Rather, the evidence portrayed the defendant as a violent, aggressive, and dangerous individual." *Id.* at 563. The court held that "[t]he improper character evidence cannot be said to be nonprejudicial." *Id.* at 564. It then reversed the conviction and remanded the case for a new trial.

As in *Triplett*, the evidence presented in this case that the defendant had a bad temper, which he had displayed in the past, does not fall within any of the exceptions to the general rule prohibiting the admission of such evidence. The Commonwealth contends, however, that when a defendant claims that he acted in self-defense, that alone should be sufficient to introduce the issue of his bad temper. In *Triplett*, the defendant claimed that he had acted in self-defense; yet the court held that evidence of his bad temper and other prior bad acts was not admissible.

In the circumstances of this case, the admission of this evidence created a substantial risk of a miscarriage of justice. The decisive issue here was the credibility of the complainant and the defendant who testified to conflicting versions. The complainant testified that he was injured in an unprovoked attack by the defendant; the defendant, in turn, offered evidence that he hit the complainant in self-defense. Testimony that the defendant had a bad temper and that LaPlante had previously seen the way he acted when provoked, and the reliance by the prosecutor in his closing argument on that evidence could have had the effect of enhancing the complainant's credibility. "[W]e cannot say 'with fair assurance' that the improperly admitted evidence did not have a significant impact on the jury's decision." *Commonwealth* v. *Ford*, 397 Mass. 298, 302 (1986).[6]

2. *The amendment of the indictment.* The defendant claims that the judge improperly allowed amendment of the indictment that charged him with assault and battery by means of a dangerous weapon, to wit, a blackjack. Because the problem might recur at the new trial, we will briefly comment on it.

D'Angelo testified that the defendant struck him with a "black leather thing." The defendant (and Councilman) testified that he kicked D'Angelo in the face. Prior to the judge's charge to the jury, the Commonwealth requested that the jury be instructed as to assault and battery by means of a dangerous weapon, to wit, a shod foot. The judge complied with the

---

[6] We also reverse the conviction for intimidation of a witness. The evidence offered to show that the defendant was a violent person would have tended to prove that charge. D'Angelo and the defendant's versions of the events concerning that charge conflicted, and the bad temper evidence inevitably bolstered D'Angelo's credibility.

Commonwealth's request. The defendant argues that the judge's action was, in effect, a substantial amendment of the indictment and, therefore, prohibited. See *Commonwealth* v. *Snow*, 269 Mass. 598, 606 (1930). We disagree.

"[T]he offense of assault and battery by means of a dangerous weapon under G. L. c. 265, § 15A, requires that the elements of assault be present, . . . that there be a touching, however slight, . . . that that touching be by means of the weapon . . . , and that the battery be accomplished by use of an inherently dangerous weapon, or by use of some other object as a weapon, with the intent to use that object in a dangerous or potentially dangerous fashion." *Commonwealth* v. *Appleby*, 380 Mass. 296, 308 (1980). See *Commonwealth* v. *Donoghue*, 23 Mass. App. Ct. 103, 113 (1986). The language in the indictment specifying the particular weapon used is superfluous. See *Commonwealth* v. *A Juvenile*, 365 Mass. 421, 440 (1974) (language in an indictment specifying means by which a murder is committed is superfluous).

There was no prejudice to the defendant in any event. He never denied kicking the complainant with his foot. The language in the indictment did not mislead him or prevent him from preparing a defense.

The judgments are reversed, the verdicts set aside, and the matter is remanded to the Superior Court for a new trial.

*So ordered.*

*Richard Zorza*, Committee for Public Counsel Services, for the defendant.

*Elizabeth R. Dunphy*, Assistant District Attorney, for the Commonwealth.