SUPREME JUDICIAL COURT 
 
 COMMONWEALTH vs. DONOVAN E. GOPARIAN

 
 Docket:
 SJC-13391
 
 
 Dates:
 January 10, 2025 - July 23, 2025
 
 
 Present:
 Budd, C.J., Gaziano, Kafker, Georges, & Dewar, JJ.
 
 
 County:
 Worcester
 

 
 Keywords:
 Homicide. Practice, Criminal, Fair trial, Discovery, Disclosure of evidence, Postconviction relief, New trial, Capital case. Constitutional Law, Fair trial. Evidence, Exculpatory, Third-party culprit, Disclosure of evidence
 
 

  
      Indictment found and returned in the Superior Court Department on December 21, 2016.
      A motion for a new trial, filed on June 15, 2023, was heard by Daniel M. Wrenn, J.
      Merritt Schnipper for the defendant.
      Donna-Marie Haran, Assistant District Attorney, for the Commonwealth.
      GEORGES, J.  On the evening of November 4, 2015, a resident living near a secluded dirt road in Worcester heard a loud bang.  Looking toward the direction of the sound, the resident observed flames emanating from a wooded area.  In response to the resident's 911 call, firefighters arrived at the scene and located a burning vehicle along the dirt road.  After  extinguishing the fire, they discovered a severely charred body reclined in the front passenger seat.  The victim was later identified as Marie Martin.  An autopsy subsequently revealed a bullet lodged in the victim's skull, specifically in the cheekbone area.
      The ensuing investigation led police to the defendant, Donovan E. Goparian, who was indicted by a grand jury for murder.  In 2020, a jury convicted the defendant of murder in the first degree based on a theory of deliberate premeditation.
      Following his conviction, the defendant filed a motion for a new trial.  Among other arguments, he contended that the Commonwealth failed to disclose exculpatory evidence -- namely, statements made by a Federal inmate during a proffer session -- that implicated a third party in the victim's murder.  The defendant also sought postconviction discovery concerning the proffer session.  The motion judge, who also presided over the defendant's trial, denied the defendant's request for an evidentiary hearing and, without addressing it, failed to act on the defendant's request for postconviction discovery.  The motion for a new trial was then denied.  The defendant appealed from both his conviction and the denial of his motion for a new trial.
      In this consolidated appeal, the defendant raises multiple claims of error.  We address only two:  (1) whether the judge abused his discretion by denying the defendant's request for an evidentiary hearing on his motion for a new trial, and (2) whether the judge erred in failing to act on the defendant's request for postconviction discovery.  We conclude that the judge abused his discretion on both grounds.
      Accordingly, we vacate the order denying the defendant's motion for a new trial, reverse the order denying the defendant's request for an evidentiary hearing, and remand the case for further proceedings consistent with this opinion.  In light of this disposition, we defer plenary review of the defendant's direct appeal pursuant to G. L. c. 278, § 33E.  See Commonwealth v. Chatman, 466 Mass. 327, 339 (2013), S.C., 473 Mass. 840 (2016).
      Background.  1.  Trial evidence.  At trial, the Commonwealth introduced evidence of the following facts.
      The defendant first became acquainted with the victim through Thomas Hogan, Jr.  Hogan, a handyman by trade, had worked on properties owned by the victim and her former boyfriend.  Beyond this professional connection, Hogan and the victim maintained a casual friendship and would occasionally "hang out."
      The victim had a tumultuous, on-again, off-again romantic relationship with her ex-boyfriend, which ultimately ended towards the end of 2014.  The following year, the ex-boyfriend was awarded temporary custody of their daughter.  In the wake of the breakup, the victim solicited Hogan to "beat up" her ex-boyfriend "severely."  Hogan refused but offered to locate someone willing to do so.  Over time, the victim's request escalated to murder.
      Hogan first recruited an acquaintance who accepted a payment from the victim but later reneged.  Hogan then approached the defendant, another acquaintance.  According to Hogan, the defendant agreed to "severely beat up or murder[]" the ex-boyfriend in exchange for $2,500.  This time, however, the victim insisted on meeting the defendant before providing any payment.
      Hogan scheduled the meeting for November 4, 2015, at approximately 3 P.M., in a secluded park near Webster Lake -- a location familiar to the victim.  That day, Hogan picked up the defendant from his residence.  During the drive, they discussed the upcoming meeting, with the defendant allegedly remarking that he intended to have sex with the victim, whom he thought was "cute."  Hogan dropped the defendant off at a nearby package store, located about a five-minute walking distance from the designated meeting spot.  Hogan provided the defendant with directions and a description of the victim's vehicle, a "greenish" four-door Ford Focus.
      Uncertain whether he should remain nearby, Hogan lingered in the area.  After multiple unsuccessful attempts to contact both the defendant and the victim by cell phone, Hogan eventually reached the victim.  According to Hogan, during that call, the victim stated that the defendant had "groped" her and then "shot her in the head."  Because the victim was "talking normal[ly]," Hogan believed she was joking.  The call abruptly ended.
      Approximately forty-five minutes later, as Hogan was driving home, he received a call from the defendant, who was using the victim's cell phone.[1]  During this conversation, the defendant allegedly admitted that he "did something" to the victim and warned that the police might soon contact Hogan, as Hogan was "the last one to see her and talk to her."  The defendant also threatened that if Hogan implicated him to law enforcement, he would "hurt" Hogan and his family.
      That evening, at around 9 P.M., the defendant's live-in girlfriend, Heidi Thompson, called the defendant's nephew, William Goparian-McElhinney (Billy).[2]  Thompson had last seen the defendant that morning, when he told her he was "going to work" with Hogan.  Later in the day, the defendant had called Thompson asking her to get in touch with Billy.  When Thompson reached Billy, he informed her that he had not seen the defendant and ended the call.
      Thompson drove to Billy's residence in Worcester, where she observed a "grayish blue" four-door sedan parked across from the driveway and saw the defendant pacing outside.  Billy arrived shortly thereafter and likewise noticed a "dark gray boxy sedan" and the defendant's "frantic" demeanor.
      Although Billy and the defendant had been "extremely close" in prior years, by November 2015 their relationship had become "hostile."  Nonetheless, the defendant approached Billy, professing, "Billy, I really do love you."  The defendant then explained that Thompson's vehicle was out of gasoline and inquired whether Billy had any.  When Billy responded that he did not, the defendant declined an offer of money for gasoline, became "aggravated," and began pacing, "mumbling," and "swearing."
      At some point, the defendant remarked to Billy, "I hemmed up a stripper";[3] Billy interpreted this statement as an admission that the defendant had "[s]everely injured or killed" someone.  An argument ensued, with Billy chastising the defendant for "bringing [his] drama" to Billy's home and eventually ordering the defendant to leave.  As the defendant entered the "boxy" sedan, Billy noticed a blanket covering the back seats that appeared "elevated" near the rear window.
      Thereafter, accounts diverge.  Thompson testified that Billy asked her for a ride, prompting her to drive him around the block for approximately five minutes before returning to his home.  Billy, however, denied this, testifying instead that a friend had picked him up, that he stayed at the friend's house for several hours, and that when he returned home around midnight, the sedan was no longer present.
      In any event, Thompson testified that after returning to Billy's house, the defendant told her he needed to dispose of the sedan.  Thompson offered her assistance, which the defendant accepted.  Driving separately, Thompson followed the defendant as he drove the sedan to a secluded dirt road.  Once there, the defendant got out of the vehicle, poured "a liquid" over it, and set it ablaze.  The defendant then joined Thompson in her vehicle, and after they drove away, he told her she was "not going to like what [she] see[s] in the news."
      Later that evening, firefighters responded to the burning vehicle.  After extinguishing the flames, they discovered a body reclined in the front passenger seat.  Although "extremely charred," the body was ultimately identified as that of the victim through dental records.  An autopsy revealed a bullet lodged in the victim's skull, around her cheekbone.  The medical examiner testified at trial that the cause of the victim's death was a gunshot wound to the head.[4]
      The following day, upon learning of the body's discovery, Thompson confronted the defendant.  When she asked him why he had a body in the vehicle, the defendant merely chuckled and responded that "it wasn't him."  However, Thompson testified that in subsequent days, the defendant offered her two distinct explanations for the victim's death.  In one, he claimed that the victim wished to die but preferred to hire someone rather than take her own life.  In the other, he alleged that the victim wanted to frame her ex-boyfriend for her death.  Thompson further testified that the defendant admitted to shooting the victim in the head, but when "it didn't take," he "had to strangle her."  According to Thompson, the defendant also disclosed that, in the interim between being shot and strangled, the victim had made telephone calls to Hogan -- either as a ruse to "throw . . . off" detectives or, alternatively, as a plea for help.
      Several days after the murder, Billy received a telephone call from the defendant, during which the defendant asked whether Billy was "insinuating that [the defendant] had anything to do with the . . . homicide that took place."  Billy denied that he was doing so.  Approximately one hour later, the defendant appeared at Billy's residence, entered Billy's bedroom, and again warned him not to suggest he was involved in the homicide or the car fire.  The defendant then paused and stated, "[B]ecause I did it."  Billy interpreted this as a threat.
      2.  Revelation of exculpatory witness.  In December 2016, the defendant was indicted for murder in the first degree, in violation of G. L. c. 265, § 1.[5]  A jury trial commenced in the Superior Court in January 2020.  On February 10, 2020 -- the ninth day of trial -- trial counsel moved for a continuance to secure the testimony of an incarcerated witness.  The motion was supported by counsel's affidavit, in which he attested that, on February 8, he had learned of a potential exculpatory witness, Vito Nuzzolilo, who was then awaiting sentencing in a Federal detention facility in Rhode Island.  Counsel further averred that, during a February 9 meeting attended by himself, Nuzzolilo, and Nuzzolilo's attorney, Nuzzolilo stated that Billy had "burned the car and destroyed the gun" and "looked down" when Nuzzolilo asked him about the murder.
      At the motion hearing, trial counsel provided additional context.  Counsel explained that Nuzzolilo had contacted his attorney after reading about the defendant's trial in a newspaper, expressing concern that Billy had committed perjury.  During the February 9 meeting, Nuzzolilo informed trial counsel that he had previously participated in a proffer session with Federal prosecutors and agents in 2018, during which he disclosed that Billy -- who had lived with him for a time -- had admitted to burning the victim's car and breaking the murder weapon into three pieces, later disposing of it in a river or lake.  According to Nuzzolilo, Federal prosecutors had advised him at the time that they were not interested in pursuing his information.
      Nuzzolilo's attorney, who had also attended the 2018 proffer session, corroborated these details to the judge.  He recalled that Worcester police officers may also have been present, but likewise had shown no interest in the information.  The attorney also conveyed that Nuzzolilo was willing to testify at trial and to submit an affidavit if requested.
      The prosecutor acknowledged awareness of the proffer, stating that Federal agents had deemed Nuzzolilo "not credible."  The prosecutor also maintained that Federal authorities did not consider it exculpatory under Brady v. Maryland, 373 U.S. 83 (1963), and, thus, the prosecutor had taken no further action.[6]
      The judge denied the motion for a continuance.  In doing so, the judge noted that (1) no affidavit from Nuzzolilo had been submitted; (2) the trial was nearing its conclusion, with the case almost ready for jury submission; (3) the underlying information had existed since 2018 and had already been assessed by third parties as lacking credibility; and (4) logistical challenges would likely complicate efforts to secure testimony from a Federally incarcerated witness located out of State.  The judge further reasoned that, at best, the proffered testimony implicated a third party in malicious destruction of property -- not murder -- as Nuzzolilo did not claim that Billy had confessed to killing the victim.
      Following the denial of the motion, trial resumed, and the jury returned a verdict of guilty of murder in the first degree on a theory of deliberate premeditation.  The defendant was sentenced to life imprisonment without the possibility of parole.
      3.  Postconviction proceedings.  In March 2021, the defendant filed a motion for postconviction discovery seeking "all documents or information" concerning the Worcester police department's participation in the 2018 Federal proffer session involving Nuzzolilo, as well as any records reflecting the substance of that session in the possession of the Commonwealth or the Worcester police.  In support of the motion, the defendant's appellate counsel submitted an affidavit describing a May 2020 discussion with Nuzzolilo[7] and noting that he had requested the 2018 proffer-related documents from the United States Attorney's office in writing.  In response, the Commonwealth denied having "care, custody or control" of such materials, a position it reiterated at the motion hearing.
      Subsequently, the defendant supplemented his motion, notifying the court that he had obtained a three-page report regarding the 2018 proffer session (Nuzzolilo report) from the United States Attorney's office.  Prepared in September 2018, the Nuzzolilo report identified Worcester police Detective Mark Richardson -- an investigator of the victim's homicide -- in a section labeled "Other Officers."  According to the report, at the 2018 proffer session, which occurred on September 5, 2018, Nuzzolilo stated that Billy had confessed to burning the victim's vehicle, and that when Nuzzolilo asked if he had shot the victim, Billy "hung his head" in a manner that Nuzzolilo interpreted as an implicit admission.[8]  Despite this additional information, the defendant's motion for postconviction discovery was denied.
      Approximately two years later, the defendant filed a motion for a new trial in this court, which was remitted to the Superior Court for disposition.  The motion alleged, among other things, that the Commonwealth had failed to disclose exculpatory evidence regarding Nuzzolilo's proffer.  Appended to the motion were the Nuzzolilo report and an affidavit from trial counsel, who averred that had he either been aware of the Nuzzolilo information before trial or been granted a continuance when he learned of the information during trial, he would have sought to secure Nuzzolilo's testimony and to obtain any relevant documentation.
      At a nonevidentiary hearing, the defendant's appellate counsel requested an evidentiary hearing at which he would call trial counsel and Richardson as witnesses, though counsel expressed uncertainty about calling Nuzzolilo due to logistical concerns.  The prosecutor opposed the request, stating that the Commonwealth "would accept everything [trial counsel] says in his affidavit," thereby obviating the need for live testimony.  At the hearing, the defendant's appellate counsel submitted an affidavit from Nuzzolilo affirming the accuracy of his prior statements and expressing a willingness to testify consistently with the Nuzzolilo report if called at a hearing on the motion for a new trial.
      The judge denied the request for an evidentiary hearing.  Approximately one month later, the defendant filed a supplement to his motion for a new trial and a renewed motion for postconviction discovery.  In support of both, the defendant included an affidavit from appellate counsel describing counsel's recent receipt of an e-mail message obtained through a public records request.  The e-mail message, sent by Richardson to the prosecutor roughly two years before trial, stated:
"Just wanted to advise you that the person in the proffer basically said we had the wrong guy and that Billy was the right guy.  He said that Billy made admissions to him, etc.  I told the agents that the evidence did not support this information.  They thought maybe Billy was trying to impress the guy -- if the guy was telling the truth.  I will be happy to fill you in if you have any questions.  Just wanted to give you the gist of it."
The defendant sought a court order compelling the Commonwealth to produce all documents related to Nuzzolilo's proffer, with particular focus on Richardson's knowledge of the proffer session.
      The judge denied the defendant's motion for a new trial in May 2024 and took no further action on the motion for postconviction discovery.  The defendant subsequently appealed from the denial of his motion for a new trial, as well as from all adverse rulings subsidiary to that order.  That appeal was consolidated with his direct appeal from the conviction.
      Discussion.  In appeals arising from the denial of a motion for a new trial, when consolidated with a direct appeal from a conviction of a capital crime, we review preserved or properly raised claims under the applicable constitutional or common-law standards.  Commonwealth v. Bateman, 492 Mass. 404, 410-411 (2023).  As noted, while the defendant raises multiple claims in this consolidated appeal, our analysis focuses on whether the judge abused his discretion in (1) denying the defendant's request for an evidentiary hearing and (2) implicitly denying the defendant's renewed motion for postconviction discovery.[9]
      1.  Evidentiary hearing.  The denial of a motion for a new trial without an evidentiary hearing is reviewed for significant legal error or abuse of discretion.  Commonwealth v. Alemany, 488 Mass. 499, 517-518 (2021).  Where, as here, the motion judge also presided over the trial, we afford special deference to that decision, recognizing the judge's "superior position to assess the credibility of the defendant's claims."  Commonwealth v. Lora, 494 Mass. 235, 245 (2024), quoting Commonwealth v. Upton, 484 Mass. 155, 162 (2020).  Reversal for abuse of discretion in such circumstances "is particularly rare" (citation omitted).  Commonwealth v. Rice, 441 Mass. 291, 302 (2004).
      A judge may deny a motion for a new trial without an evidentiary hearing if the motion fails to raise a substantial issue.  Upton, 484 Mass. at 161.  See Mass. R. Crim. P. 30 (c) (3), as appearing in 435 Mass. 1501 (2001).  Whether a substantial issue is raised turns on two factors:  (1) "the seriousness of the issue asserted," and (2) "the adequacy of the defendant's showing" in support of that issue.  Commonwealth v. Robinson, 493 Mass. 718, 723 (2024), quoting Commonwealth v. Stewart, 383 Mass. 253, 257-258 (1981).  We address each in turn.
      a.  Seriousness of the issue asserted.  The first prong of the "substantial issue" inquiry is satisfied.  Both the Federal Constitution and art. 12 of the Massachusetts Declaration of Rights guarantee a defendant's right to the disclosure of "material, exculpatory evidence in [the Commonwealth's] possession or control" (citation omitted).  Graham v. District Attorney for the Hampden Dist., 493 Mass. 348, 361 (2024).  See art. 12 of the Massachusetts Declaration of Rights (defendant "shall have a right to produce all proofs, that may be favorable to him"); Mass. R. Crim. P. 14, as appearing in 442 Mass. 1518 (2004).  This right, while broad, "is not boundless."  Commonwealth v. Mcfarlane, 493 Mass. 385, 391 (2024).  Among its bounds, to constitute a breach of a prosecutor's constitutional duty, a prosecutor's failure to disclose exculpatory evidence must be "of sufficient significance to result in the denial of the defendant's right to a fair trial" (citation omitted).  Matter of a Grand Jury Investigation, 485 Mass. 641, 648 (2020).
      As we have recognized, third-party culprit evidence implicates a defendant's constitutional right to present a complete defense.  Commonwealth v. Scott, 470 Mass. 320, 327 (2014).  Here, the defendant has presented evidence that the Commonwealth failed to disclose exculpatory information -- evidence that, if true, undermines the fairness of the trial.  We therefore proceed to the second prong:  whether the defendant has made an adequate showing on this issue.  But cf. Alemany, 488 Mass. at 518-519 (no abuse of discretion where defendant failed to make sufficient showing, despite raising serious issue); Upton, 484 Mass. at 162 (no abuse of discretion where judge found defendant's Brady claim insufficient to warrant evidentiary hearing).
      b.  Adequacy of the defendant's showing.  A defendant "need not prove the motion's factual premise," but must present credible information sufficient "to cast doubt on the issue" (citation and alteration omitted).  Upton, 484 Mass. at 162.  Where the Commonwealth has allegedly failed to disclose exculpatory evidence, the defendant must demonstrate that (1) the evidence was in the "possession, custody, or control" of the prosecutor or someone under the prosecutor's authority; (2) the evidence is exculpatory; and (3) the defendant suffered prejudice as a result of its nondisclosure (citation omitted).  Mcfarlane, 493 Mass. at 390.
      The Commonwealth does not dispute that it never provided the Nuzzolilo report and the Richardson e-mail message, nor does it contend that these materials are not exculpatory.  Instead, the Commonwealth argues that the Nuzzolilo report was in the possession of an uninvolved Federal agency, beyond the Commonwealth's control,[10] and further contends that any nondisclosure of the e-mail message or the proffer was nonprejudicial.  Accordingly, our analysis begins with the question of possession, custody, or control before addressing the defendant's showing of possible prejudice.
      i.  Possession, custody, or control.  The judge found that the defendant failed to establish that the Nuzzolilo report -- prepared by the United States Department of Justice --was within the possession, custody, or control of the prosecutor or any member of the prosecution team.  As a result, the judge concluded that the Commonwealth was under no obligation to obtain or disclose this evidence.  To the extent this conclusion pertains to the physical report, we need not resolve that issue.  However, insofar as it concerns the underlying information contained in the report, we disagree.
      The Commonwealth's disclosure obligation extends to materials in the "possession, custody, or control" of any member of the prosecution team, including law enforcement officers who have participated in the investigation or evaluation of the case and have reported to the prosecutor (citation omitted).  Graham, 493 Mass. at 361-362.  Records held by Federal officials unconnected to the case fall outside this obligation.  Commonwealth v. Ayala, 481 Mass. 46, 56 (2018).  However, a prosecutor remains duty-bound to learn of exculpatory evidence known to those acting on the Commonwealth's behalf, including local police detectives.  Commonwealth v. Lykus, 451 Mass. 310, 327 (2008).
      Here, the defendant presented credible evidence suggesting that Detective Richardson -- an investigator in the case and undisputed member of the prosecution team -- was present during Nuzzolilo's proffer session.  The Nuzzolilo report itself lists Richardson under "Other Officers," presumably indicating his attendance.  Furthermore, Richardson sent an e-mail message to the prosecutor advising him of the proffer, relaying select details, and offering to provide further information.
      Given Richardson's role, the prosecutor was obligated to follow up on that offer:  to inquire into what Richardson had learned during the proffer session, including information reflected in the Nuzzolilo report.  See Mass. R. Crim. P. 14.  Indeed, as stated in Mcfarlane, 493 Mass. at 393, prosecutors must "ask other members of the prosecution team whether all discoverable materials relating to a particular case have been given to the Commonwealth" (quotation and citation omitted).  Similarly in Graham, 493 Mass. at 369, we underscored that the duty of inquiry "demands, at the very least, that prosecutors ask other members of the prosecution team whether exculpatory information exists."
      Accordingly, any information obtained from Richardson -- given that he was a member of the prosecution team -- would fall squarely within the Commonwealth's disclosure obligations.  As Graham, 493 Mass. at 362, makes clear, this duty extends to information in the possession of any prosecution team member, even if it is not personally known to the prosecutor.
      Moreover, the mere fact that participants in the proffer session may have questioned the credibility of Nuzzolilo's statements does not relieve the prosecutor of the duty to disclose them.  Once information is determined to be exculpatory, disclosure is mandatory -- without exception.  See Matter of a Grand Jury Investigation, 485 Mass. at 650 ("once the information is determined to be exculpatory, it should be disclosed -- period.  And where a prosecutor is uncertain whether information is exculpatory, the prosecutor should err on the side of caution and disclose it").  See also id. at 649 (disclosure obligation is broad, requiring disclosure of "any facts" that tend to exculpate or diminish defendant's culpability); Mass. R. Crim. P. 14 (b) (2), as appearing in 463 Mass. 1501 (2012).
      At this juncture, the defendant has presented credible evidence suggesting that Richardson had knowledge of Nuzzolilo's proffer.  As a result, we conclude that the defendant has adequately shown that the Commonwealth had possession, custody, or control of the information.  See Commonwealth v. Kostka, 489 Mass. 399, 412 (2022) ("Once a third-party record is obtained by the Commonwealth, . . . it becomes part of the prosecutor's case file, triggering discovery obligations").
      ii.  Prejudice.  We next address whether the defendant made an adequate showing of potential prejudice resulting from the Commonwealth's failure to disclose the Nuzzolilo information.  At the outset, we emphasize that the ultimate determination of prejudice is reserved for the judge following an evidentiary hearing.  Commonwealth v. Holbrook, 482 Mass. 596, 611 (2019).  Nonetheless, the question of potential prejudice is central to determining whether such a hearing is warranted.  See, e.g., Commonwealth v. Gordon, 82 Mass. App. Ct. 389, 401 (2012) ("The defendant has therefore raised a substantial issue as to prejudice.  On remand, he bears the burden of establishing prejudice" [citation omitted]).
      Where, as here, the defendant made a specific pretrial request for exculpatory evidence,[11] he need only demonstrate a "substantial basis for claiming prejudice" from the nondisclosure (citation omitted).  Commonwealth v. Imbert, 479 Mass. 575, 582 (2018).  This burden may be satisfied by pointing to the facts in the record supporting a conclusion that timely disclosure would have influenced the jury.  Id.  In other words, the relevant inquiry is whether there exists a reasonable possibility that the undisclosed evidence would have affected the outcome of the trial.  Id.
      The judge concluded that the defendant failed to make such a showing, citing three reasons:  (1) a perceived lack of credible information in Nuzzolilo's statements; (2) the belief that the statements were cumulative of other impeachment evidence; and (3) the view that the Commonwealth's case was overwhelming.[12],[13]
      On appeal, the defendant contends that timely disclosure would have enabled him to obtain the Nuzzolilo report, use it to impeach a key Commonwealth witness (Billy), and pursue a third-party culprit defense implicating Billy as the actual perpetrator.[14]  See Scott, 470 Mass. at 327 ("substantial connecting links to the crime" are required to admit hearsay evidence concerning third-party culprit [quotation and citation omitted]).  The Commonwealth, for its part, adopts the reasoning of the judge.  For the reasons discussed below, we conclude that the defendant has raised a substantial issue of potential prejudice.
      We recognize that, in evaluating whether a defendant has made an adequate showing, a motion judge may assess whether the submitted evidence contains "credible information of sufficient quality to raise a serious question."  Commonwealth v. Vaughn, 471 Mass. 398, 404 (2015).  A judge is not bound to credit affidavit statements merely because they are submitted.  Commonwealth v. Torres, 469 Mass. 398, 403 (2014).  However, where a judge's findings rest solely on documentary evidence, including affidavits, appellate review is de novo.  Commonwealth v. Drayton, 479 Mass. 479, 486 (2018).
      Here, the judge erred in discrediting Nuzzolilo's affidavit -- and by extension, the statements memorialized in the Nuzzolilo report -- without the benefit of live testimony.  The judge emphasized that Nuzzolilo, facing a lengthy Federal drug sentence at the time of his original proffer, had motive to fabricate.[15]  But this reasoning overlooks a critical fact:  Nuzzolilo reaffirmed the accuracy of his earlier statements in an affidavit executed over five years later -- long after Federal authorities had declined to act on the information.  Accordingly, Nuzzolilo's incarcerated status alone does not justify discrediting his statements.  Commonwealth v. Smith, 90 Mass. App. Ct. 261, 269 (2016) (abuse of discretion where judge discredited affiant solely based on incarceration and criminal record).
      The judge further erred by relying on the assessments of law enforcement -- namely, Richardson and the Federal agents -- regarding Nuzzolilo's credibility.  Such reliance was misplaced, as it effectively "substitute[s] the police for the prosecutor, and even for the courts themselves," as arbiters of government disclosure obligations (citation omitted).  Graham, 493 Mass. at 370.  Cf. Commonwealth v. Triplett, 398 Mass. 561, 567 (1986) ("a witness cannot be asked to assess the credibility of his testimony or that of other witnesses" [citation omitted]).
      Moreover, the judge overlooked key evidence supporting the reliability of Nuzzolilo's account.  Notably, Nuzzolilo's source was allegedly Billy himself -- the individual later implicated by the defendant as the third-party culprit -- which lends significantly more weight to the information than vague or unsubstantiated rumors.  Cf. Scott, 470 Mass. at 327-328 (rejecting as "patently unreliable" two reports where source of information was unknown or rumor based).  The record also shows that Nuzzolilo and Billy lived together after the murder, making the alleged disclosure plausible.  The Nuzzolilo report further indicates that Nuzzolilo had correctly recounted many of the key facts of the case, reinforcing the potential reliability of his account.  Finally, a police investigation report made in preparation for trial reveals that Thompson, days before the trial, recalled for the first time that she drove Billy to get gasoline the night the victim's vehicle was burned -- a fact that Billy disputes, but that aligns with Nuzzolilo's account.
      We also disagree with the judge's conclusion that the Nuzzolilo information was merely cumulative of impeachment evidence already introduced.  At trial, impeachment focused primarily on prior inconsistent statements suggesting, at most, that Billy might have assisted the defendant.  By contrast, the Nuzzolilo information directly implicated Billy as the principal actor -- a critical distinction, as it supports a third-party culprit defense, not just impeachment.  See Commonwealth v. Wray, 88 Mass. App. Ct. 403, 409 (2015) (rejecting cumulative evidence rationale where new evidence was "diametrically opposed to the witness's in-court testimony").
      Billy's alleged admissions that he burned the victim's car and destroyed the murder weapon, as well as his reaction when asked about the killing (hanging his head), all support an inference that Billy, not the defendant, was the killer.  See Commonwealth v. Robinson, 493 Mass. 303, 316 (2024).  Given that the Commonwealth's case hinged largely on witness testimony, the excluded evidence would not have served merely to impeach a witness -- it would have provided substantive support for a third-party culprit defense, a defense theory that is well established and significant.  See Commonwealth v. Shakespeare, 493 Mass. 67, 90 (2023).
      Accordingly, the judge abused his discretion in denying an evidentiary hearing.  The defendant has made an adequate showing of potential prejudice, warranting further inquiry into the credibility and reliability of the Nuzzolilo information.  See Scott, 470 Mass. at 327.  In so concluding, we again acknowledge that reversal based on the denial of a motion for a new trial without an evidentiary hearing is "particularly rare" -- and we do not suggest that such a denial ordinarily constitutes an abuse of discretion (citation omitted).  Upton, 484 Mass. at 162.  But this is that rare case.  
      2.  Postconviction discovery.  Having concluded that the defendant is entitled to an evidentiary hearing on his motion for a new trial, we now address whether he is also entitled to postconviction discovery in connection with that hearing.
      Postconviction discovery serves a focused and important purpose:  to enable a defendant to "gather evidence to support an apparently meritorious claim where the evidence that can be adduced to support the claim is unknown to the court" (quotation, citation, and alterations omitted).  Commonwealth v. Ware, 471 Mass. 85, 94 (2015).  In accordance with Mass. R. Crim. P. 30 (c) (4), as appearing in 435 Mass. 1501 (2001), a judge may authorize such discovery when the defendant's submitted affidavits "establish a prima facie case for relief."  Commonwealth v. Sealy, 467 Mass. 617, 628-629 (2014).  The decision to permit postconviction discovery rests within the "broad discretion" of the motion judge.  Holbrook, 482 Mass. at 606.
      Here, the judge abused that discretion by failing to rule on the defendant's request for postconviction discovery relating to the Nuzzolilo proffer session.  For largely the same reasons as noted above, the defendant's affidavits from counsel and Nuzzolilo established a prima facie case warranting postconviction discovery.
      Moreover, the Commonwealth initially asserted it had no responsive documents, a representation that was later proven inaccurate.  This misstatement raises a legitimate concern that further inquiry could uncover additional exculpatory material.  Significantly, the defendant independently obtained the Richardson e-mail message through a public records request -- demonstrating not only that such evidence existed, but also that the Commonwealth withheld it.  Contrast Commonwealth v. Camacho, 472 Mass. 587, 601 (2015).  The defendant has made a sufficient showing that discovery is "reasonably likely to uncover evidence that might warrant granting a new trial" (citation omitted).  Sealy, 467 Mass. at 629.
      Conclusion.  In these circumstances, we conclude that the defendant has met the standard for both postconviction discovery and an evidentiary hearing.  We therefore reverse the order denying the request for an evidentiary hearing and vacate the order denying the motion for a new trial.  We further remand the matter to the Superior Court for the entry of an order allowing postconviction discovery concerning the Nuzzolilo information and for an evidentiary hearing concerning the Nuzzolilo information.  If discovery yields additional evidence relevant to the defendant's claim for relief, the defendant shall be permitted to amend his motion for a new trial accordingly.
      We defer our review under G. L. c. 278, § 33E, pending resolution of the motion for a new trial.
      So ordered.
 
footnotes

 
[1]       A criminal intelligence analyst reviewed pertinent cell phone records and testified regarding the communications data from the day of the murder.  According to the analyst, approximately fourteen communications were exchanged between Hogan's cell phone and the victim's primary cell phone.  An additional thirty-one communications occurred between Hogan's cell phone and a second cell phone believed to belong to the victim.  Further, there were twenty-five communications between Hogan's cell phone and the defendant's cell phone.  Notably, no communications were recorded between the defendant's cell phone and either of the victim's cell phones.      
      The analyst also testified that on that same day, at 4:34 P.M., a call between the victim's second cell phone and Hogan's cell phone lasted between 173 and 187 seconds.  Cell site location data placed the victim's cell phone in the southern Worcester area between 3 P.M. and 4 P.M that day.  In contrast, the defendant's cell phone exhibited no activity between 2:03 P.M. and 6:59 P.M. on that day.
[2]       At trial, this witness was consistently referred to by his nickname, "Billy."  For the sake of clarity, and to avoid any confusion between this witness and the defendant, we shall adopt the same convention.
[3]       The victim was known to have worked as a dancer at a local strip club.
[4]       Although the murder weapon was never recovered, both Thompson and Hogan testified that the defendant owned an old firearm.  Hogan described the weapon as a .32 caliber revolver, and stated that, prior to meeting with the victim, the defendant sent Hogan a text message requesting that he obtain .32 caliber ammunition.  According to Thompson, the defendant told her that he had "stashed" the firearm at the residence of the victim's ex-boyfriend.
[5]       The defendant was also indicted on charges of malicious damage to a motor vehicle, in violation of G. L. c. 266, § 28 (a); and intimidation of a witness, in violation of G. L. c. 268, § 13B.  The Commonwealth subsequently entered a nolle prosequi with respect to these two charges.
[6]       After trial, the prosecutor sought to correct himself, stating that at no point did the assistant United States attorney involved characterize the information as "not Brady material."
[7]       During the discussion, Nuzzolilo relayed many of the same details that were previously raised in connection with the defendant's motion for a continuance.  Nuzzolilo also offered several additional details.  Of note, according to Nuzzolilo, Billy told him that the defendant was not responsible "for that girl."
[8]       Billy further disclosed that he "smashed" the firearm used in the murder and dumped the pieces in a nearby reservoir.  Federal agents discussed these statements with Richardson, who stated that while "many of the alleged facts of the murder case [were] correct," evidence existed "to the contrary."
[9]       See Commonwealth v. Duguay, 492 Mass. 520, 521 n.1 (2023), citing Commonwealth v. Dubois, 451 Mass. 20, 29 (2008) (motion for postconviction discovery implicitly denied where judge does not rule on it).
[10]       The Commonwealth does not dispute that the Richardson e-mail message was in its possession, custody, or control.  Our analysis therefore focuses on the Nuzzolilo report.
[11]       The record reflects that the defendant made a specific pretrial request for "[a]ny cooperation and/or immunity agreements entered into between any witness or potential witness and the government," as well as "[a]ll notes of those who attended proffer sessions with cooperators or people who while not having a written agreement have not been charged but are legally culpable."  The parties dispute whether this request was sufficiently specific.     
      We conclude that the request was "sufficiently specific to place the prosecution on notice as to what the defense desires."  Commonwealth v. Wilson, 381 Mass. 90, 108–109 (1980).  Cf. Commonwealth v. Daniels, 445 Mass. 392, 404 n.23 (2005) (holding that request for "[a]ll statements of persons concerning [third party who had issues with murder victim]" and "[a]ll police reports concerning the recovery of [that third party's] body and/or the investigation of his death" was sufficiently specific); United States v. Warhop, 732 F.2d 775, 778 (10th Cir. 1984) (holding that request for "[a]ny [Federal Bureau of Investigation] interview statements . . . which tend to exculpate the Defendant or impeach the testimony of Government witnesses" was sufficiently specific).     
      To be sure, the wording of the request is imprecise.  It is debatable whether Nuzzolilo qualifies as a "cooperator[] or [person] who while not having a written agreement ha[s] not been charged but [is] legally culpable," and thus whether Richardson's e-mail message falls within its scope.  Nevertheless, the prosecutor should have recognized from the request's general thrust that the defense sought notes of proffer sessions implicating individuals other than the defendant.  Cf. Commonwealth v. McDonagh, 480 Mass. 131, 138 (2018) ("Perfection is not the standard by which we measure the adequacy of an objection"); Government of the V.I. v. Martinez, 780 F.2d 302, 307 & n.5 (3d Cir. 1985) (request for confessions "subsequently reduced to writing" may be sufficiently specific even if confession was not so reduced).     
      Finally, while the proffer session itself was not conducted "for the sole purpose of investigating the crime at bar," Commonwealth v. Gallarelli, 399 Mass. 17, 22 (1987), Richardson's e-mail message -- distinct from the proffer session and the Nuzzolilo report -- was specifically intended to apprise the prosecutor of details relating solely to the present case.  Under these circumstances, we conclude that the defendant's request was sufficiently specific.
[12]       The judge also reasoned that it was "speculative to suggest that the defendant might have produced Nuzzolilo, who was in [F]ederal custody."  We disagree.  While Nuzzolilo's incarceration may have posed logistical challenges, it does not render the prospect of securing his testimony speculative -- particularly given his expressed willingness to testify.  See Barber v. Page, 390 U.S. 719, 723 (1968) (rejecting notion that "mere absence of a witness from the jurisdiction" suffices to excuse confrontation in light of "increased cooperation between the States themselves and between the States and the Federal Government").  This is not a case where the witness was missing.  See Commonwealth v. Castro, 438 Mass. 160, 167-168 (2002) (finding it speculative whether more timely disclosure would have enabled defense to locate witness whose whereabouts were unknown).  Here, Nuzzolilo's location was certain.
[13]           While we reserve a more comprehensive assessment of the evidence for our plenary review, we note that the case against the defendant was not so overwhelming as to preclude an evidentiary hearing.  To be sure, the evidence against the defendant –- only partially discussed here –- was not insubstantial.  Yet, there was no physical evidence linking the defendant to the crime scene, and the Commonwealth's witnesses presented significant credibility concerns.  Cf. Commonwealth v. Barrett, 1 Mass. App. Ct. 332, 336 (1973) (largely circumstantial evidence, with no eyewitnesses, no murder weapon, and weak motive, was "far from overwhelming").          
          For instance, during the investigation, Hogan repeatedly lied to the police about his knowledge of the murder until entering a cooperation agreement with the Commonwealth.  Similarly, Thompson admitted she initially lied in her police interview, later claiming to have told the truth.  At trial, Billy admitted to "mislead[ing] the investigation by lying" and "omitting" information.  Moreover, Thompson and Billy offered conflicting accounts.          
          Aside from the testimony from these witnesses, other evidence appeared to corroborate the defendant's involvement, but it too was far from overwhelming.  For example, cell phone records confirmed communications among key parties, but not the content of those conversations.  Additionally, jailhouse informant Thomas Millott -- who testified that the defendant confessed to shooting and burning the victim –- also suffered from credibility issues, having secured his own cooperation agreement with the Commonwealth, much like Hogan.
[14]       During trial, the judge barred defense counsel from pursuing a line of questioning related to this third-party culprit defense.
[15]       The judge also cited to Nuzzolilo's purported statement that Billy said he left the door to the victim's vehicle "open when he burned the car," to underscore an alleged inconsistency with testimony of a responding firefighter that the vehicle was found with the doors closed.  However, this statement originated from Nuzzolilo's attorney, who recounted his conversation with Nuzzolilo -- not from Nuzzolilo himself or the Nuzzolilo report.